## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CPI Card Group, Inc., and<br>CPI Card Group-Minnesota, Inc. | Court File No.  17-cv-03983 |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| John Dwyer,<br>Multipackaging Solutions, Inc.,<br>John Searfoss, and<br>Ken Glinert | **(JURY TRIAL DEMANDED)** |
| Defendants. | |

Plaintiffs CPI Card Group Inc. and CPI Card Group-Minnesota, Inc. (collectively, "CPI"), for its Complaint against Defendants John Dwyer, Multi Packaging Solutions, Inc., John Searfoss, and Ken Glinert, alleges as follows:

## INTRODUCTION

1.     This action arises from the deliberate and extensive misappropriation of a significant amount of CPI's trade secrets and other confidential business information by its former Senior Account Executive, John Dwyer, and, on information and belief, the actual and threatened disclosure of that confidential business information to Dwyer's future employer, Multi Packaging Solutions, Inc. ("MPS"), a competitor of CPI, and its employees, John Searfoss and Ken Glinert, in violation of federal, state and common law. This action also arises from Dwyer's breach of his Confidentiality and Nonsolicitation Agreement (the "Agreement"), a true and correct copy of which is attached hereto as Exhibit A, Dwyer's breach of his duty of loyalty to CPI, and MPS, Searfoss and Glinert's conspiracy aiding and abetting Dwyer in violating his

statutory, contractual and common law duties to CPI for the express purpose of competing unfairly against CPI.

2.     The immediate purpose of this lawsuit is to secure appropriate injunctive relief (i) to maintain the status quo, (ii) to prevent the actual and threatened misappropriation and use of CPI's confidential business information, and (iii) enjoin Dwyer to comply with his obligations under the Agreement. Absent the relief requested in this Complaint, CPI will suffer irreparable harm as a result of Dwyer's and MPS' misappropriation and inevitable use of CPI confidential business information, as well as the improper and unfair solicitation of its customers by Dwyer and MPS.

## THE PARTIES

3.     CPI Card Group, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 10026 West San Juan Way, Suite 200, Littleton, CO 80127. CPI Card Group-Minnesota, Inc. is a corporation organized and existing under the laws of Minnesota with its principal place of business at 100 S 5th Street, #1075, Minneapolis, MN 55402. CPI is a leading provider of payment cards and related services, including packaging products for various retail industries.  CPI's products include secure packaging for activatable point-of-sale cards.

4.     Until June 16, 2017, Dwyer was a CPI employee residing in Minnesota.

5.     On information and belief, MPS is a Delaware corporation with its headquarters located at 150 East 52nd Street, 28th Floor, New York, New York 10022.  MPS may be served with process via its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. MPS is a provider of secured card packaging, and is a direct competitor of CPI.

2

6.      On information and belief, John Searfoss is the President of Motion Envelope, Inc. (d/b/a i3 Plastic Cards), an MPS subsidiary, and resides in Dallas, Texas.

7.      On information and belief, Ken Glinert is an MPS employee residing in New York.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Dwyer because he is a resident of Minnesota, and he committed the acts complained of in this Complaint, in whole or in part, in the State of Minnesota.

9.      This Court has personal jurisdiction over MPS because MPS has substantial and continuous business contacts in the State of Minnesota. MPS has established minimum contacts within the forum such that the exercise of jurisdiction over MPS would not offend traditional notions of fair play and substantial justice.

10.      This Court has personal jurisdiction over John Searfoss and Ken Glinert because the claims stated against John Searfoss and Ken Glinert arise from and are directly related to their contacts with and activities in the State of Minnesota. Specifically, John Searfoss and Ken Glinert knowingly communicated with Dwyer in the State of Minnesota for the express purpose of wrongfully obtaining information about CPI confidential business information and technology,  business opportunities with current and prospective CPI clients, including US Bank, Target, and Blackhawk Network, for which work was performed in Minnesota, and some of which are, on information and belief, headquartered in the State of Minnesota.

11.      This Court has original jurisdiction over misappropriation of trade secret claims under 18 U.S.C. § 1836 (c).  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367.

3

8461092v1

12.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because Dwyer resides in this judicial district, because MPS, Searfoss, and Glinert transact business in the State of Minnesota, and because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTS

13.     CPI is a leader in the market for credit, debit and prepaid card printing, manufacturing, and packaging.  Among the secure payment solutions CPI provides to its customers are EMV cards (a/k/a "chip" cards), open loop, gift and general purpose reloadable prepaid cards, closed loop prepaid cards, instant issuance cards and solutions, mobile payment solutions, on-demand personalization and fulfillment solutions for customers, digital card issuance solutions and e-Services to help with card fulfillment and management.  CPI also provides card design and customization services, and it manufactures secure packages for all of its prepaid related cards.

### CPI'S MEASURES TO PROTECT ITS
### CONFIDENTIAL BUSINESS INFORMATION

14.     CPI's ability to preserve the confidentiality of its confidential business information is critical to its success. Access to CPI's confidential business information would give any of its competitors who acquired such information an unfair competitive advantage. At a minimum, a competitor would be able to use CPI's confidential business information to compete unfairly by undercutting CPI's pricing, marketing and service offerings to current and prospective customers.

15.     Accordingly, CPI has implemented comprehensive measures to protect and maintain the confidentiality of its sensitive and proprietary business information, including but not limited to written policies identifying CPI confidential information, prohibiting employee

4

disclosure, restricting access to CPI's physical facilities and databases, and establishing safeguards against electronic access to or use of CPI information.

**THE DWYER AGREEMENT**

16. In addition to the measures discussed above, CPI has a contract with Dwyer obligating him to preserve and not disclose or use CPI confidential information, except as authorized for the benefit of CPI.

17. On March 3, 2010, Dwyer executed the Agreement (Exhibit A), as a condition of employment with CPI.

18. Thereafter, Dwyer began his employment with CPI as a Senior Account Executive.

19. In his capacity as a Senior Account Executive, Dwyer was responsible for sourcing and managing CPI's client relationships throughout the country, and he was provided privileged access to CPI's confidential information in order to perform his job.

20. In March 2017, Dwyer abruptly announced his intention to quit. CPI asked him to stay on for a period of time to facilitate the transition of Dwyer's CPI customers to a new senior sales representative.

21. Dwyer agreed to remain until June 16, 2017, but as a condition for doing so Dwyer insisted on amending the terms of his Agreement. Accordingly, Dwyer and CPI entered into an Amendment to Option Award Agreement and Confidentiality and Nonsolicitation Agreement on May 12, 2017 (the "Amendment"). Exhibit B.

22. Under both the Agreement and the Amendment, Dwyer agreed not to disclose or misuse CPI's confidential business information. The Agreement provides, in relevant part:

> **I will not disclose, duplicate or record or in any other manner reproduce in whole or in part any Confidential Information**

**that I learn or acquire during my employment except as ordinarily necessary for me to perform my assigned duties on behalf of CPI Card Group or unless CPI Card Group expressly directs me to do so.** I will not remove Confidential Information from the location of my employment except as expressly permitted or directed by my supervisor.

Agreement ¶ 2(a) (emphasis added).

23.     The Agreement defines "Confidential Information" as:

any information not generally known in CPI Card Group's business as readily ascertainable by proper means by others, including CPI Group competitors or the general public, and includes trade secrets. It includes, but is not limited to, the names of CPI Card Group and its Affiliates customers and suppliers and the nature of CPI Card Group's relationships with them, for example, types and amounts of products acquired from or supplied to CPI Card Group. It includes information about CPI Card Group techniques, estimate standards, inventions and printing processes. It includes information about CPI Card Group processes and products, including information relating to its research, development, manufacturing, engineering, marketing, and selling. It also includes, but is not limited to, information about sales, data processing, compensation, pricing and finances. Confidential information includes the same or similarly defined information concerning or possessed by Affiliates of CPI Card Group. Affiliates shall mean any and all direct and indirect parent and subsidiaries of CPI Card Group-Minnesota, Inc. I acknowledge that I was formerly employed by Premier Card Solutions and that CPI Card Group purchased certain assets of Premier Card Solutions, including, among other thing, its customer lists and good will. I acknowledge and agree that as used in this Agreement, confidential information shall include the same or similarly defined information that I learned or was exposed to while an employee of Premier Card Solutions.

Agreement ¶ 1.

24.     Dwyer further agreed:

disclosure of any of CPI Card Group Confidential Information other than for the sole benefit of CPI Card Group would have a materially detrimental effect upon CPI Card Group, the monetary loss from which would be difficult, if not impossible, to measure.

6

Agreement ¶ 2(d).

25.     The Agreement provides that it shall be "construed and interpreted according to the laws of the State of Minnesota."  Agreement ¶ 13.

26.     The Amendment expressly preserved and reaffirmed the confidentiality obligations in the Agreement.  Amendment, p. 1.

27.     Unbeknownst to CPI at the time, on information and belief Dwyer had already negotiated and accepted employment with MPS, and he worked secretly with MPS and Searfoss to scope the modifications to the Amendment in to order to achieve MPS' corporate aims to compete unfairly against CPI.

28.     Dwyer's execution of the Agreement and the Amendment were knowing and informed.

29.     On June 16, 2017, Dwyer voluntarily terminated employment with CPI.

30.     At the time of his departure, CPI personnel reminded Dwyer of his obligations to CPI under the Agreement and Amendment.

31.     On information and belief, Dwyer accepted a substantially similar position with CPI's competitor, MPS, months before he ended employment with CPI.

**DWYER MISAPPROPRIATED SIGNIFICANT CONFIDENTIAL BUSINESS RECORDS BEFORE RESIGNING**

32.     As a Senior Account Executive at CPI, Dwyer made personal contact with current and prospective CPI clients, and thus developed close relationships with these clients and prospects. Further, in his role, Dwyer negotiated contracts with current and prospective clients, established pricing strategies for CPI, and had knowledge of the prices CPI quoted to its current and prospective clients.

8461092v1

33.     By virtue of his position as a Senior Account Executive, Dwyer was granted privileged access to CPI confidential business information.  His responsibilities included having access to numerous confidential documents and databases containing trade secrets and other confidential business information.  Such information includes, but is limited to client proposals, client requirements and preferences, client support needs, pricing information for current and prospective CPI clients (*e.g.*, pricing manuals, quoted prices, client price histories), and implementation details of solutions for current and prospective CPI clients (*e.g.*, design specifications for projects specific to clients, the costs to CPI for developing a specific design or solution for a client, *etc*.).  Dwyer was never authorized to remove this confidential business information from CPI or to use or disclose it outside CPI.

34.     Prior to leaving CPI's employment effective June 16, and in furtherance of his intention to join MPS, Dwyer misappropriated a significant quantity of trade secrets and other confidential business information belonging to CPI and targeted several of CPI's current and prospective clients, not for the purpose of doing his job at CPI but rather for his own gain and for use in his future employment with MPS.

35.     Dwyer accomplished this misappropriation by forwarding from his CPI email account (jdwyer@cpicardgroup.com) to his personal email account (mr.j.dwyer@gmail.com) a significant quantity of data as early as January-June 2017, including CPI quote submissions containing confidential pricing information, CPI technical documents containing confidential client information, and CPI presentations containing information about CPI's current and prospective clients, CPI's future product offerings and new, proprietary technologies, CPI's strategic plan for cards and packaging, and CPI's fraud mitigation strategies.

36.     Dwyer's misappropriation of CPI's trade secrets and other confidential business information was part of a persistent, well-orchestrated campaign of unfair competition by MPS, Searfoss, and Glinert. MPS, Searfoss, and Glinert, through their systematic, concerted, and unlawful efforts, are attempting to move business from CPI to MPS.

37.     In furtherance of MPS' scheme, Dwyer conspired with MPS, Searfoss, and Glinert to misappropriate CPI confidential information and to target CPI clients in furtherance of MPS' corporate interests while still employed by CPI.

38.     Dwyer's collusion with MPS, Searfoss, and Glinert started well before the termination of his employment with CPI on June 16, 2017. For example, Dwyer sent a copy of the Agreement to Searfoss on January 4, 2017, from his personal email account (mr.j.dwyer@gmail.com).

39.     Since at least that time, Dwyer has been helping MPS target CPI's current and prospective clients. For example, on January 9, 2017, Dwyer sent Searfoss, an email entitled "Opportunity," in which Dwyer discloses a fulfillment opportunity with one of CPI's largest customers, Incomm Digital Solutions, along with contact information for the Senior Vice President of Incomm.

40.     Dwyer's efforts were not in vain. On information and belief, Dwyer met with Searfoss in Dallas on January 20-22, 2017, and received an offer for employment from MPS as early as February 13, 2017.

41.     On information and belief, MPS, Searfoss, and Glinert purposely targeted Dwyer because of his knowledge of, and relationships with, these CPI customers. MPS, Searfoss, and Glinert thus recognized Dwyer's industry value and the importance of his acquisition by MPS.

8461092v1

42.    On March 27, 2017, Dwyer signed an employment agreement with MPS, which MPS' CEO, Mark Shore, countersigned the following day. Dwyer concealed from CPI the offer and acceptance of employment with MPS.

43.    On March 29, 2017,  after memorializing his employment agreement with MPS, and only two hours before Dwyer announced his intention to leave CPI, Dwyer announced his intention to leave CPI, and forwarded, without authorization and in quick succession, numerous emails containing CPI confidential information from his CPI email account (jdwyer@cpicardgroup.com) to his personal email account (mr.j.dwyer@gmail.com), including:

- an email on 3/29/2017 with subject "FW: touch base" including an email thread between Dwyer and Ken Gaston, VP of Roundpeak Systems LLC;
- an email on 3/29/2017 with subject "FW: Closed loop card business" including a discussion of CPI's strategies for its closed loop business;
- an email on 3/29/2017 with subject "MYCA Deck, Demo and One Pager" including confidential information and attachments from MYCA;
- an email on 3/29/2017 with subject "FW: pscu" including confidential information and an attached presentation titled "Prepaid Solutions";
- an email on 3/29/2017 with subject "FW: Paychex CIP Branch Configuration Details—CPI" including confidential information and attached chart titled "Paychex Branch Components";
- an email on 3/29/2017  with subject "FW: Virtual Gift and Payment" including confidential information and an attached presentation titled "Digital Open Loop Cards" Version 1;
- an email on 3/29/2017  with subject "FW: Virtual Gift and Payment" including confidential information and an attached presentation titled "Digital Open Loop Cards" Version 2;
- an email on 3/29/2017 with subject "FW: 2016 Card Production Specs" including confidential information about card production specifications and an attachment with 2016 card production specifications;
- an email on 3/29/2017 with subject "FW: what a nice surprise" including an email thread between Dwyer and Talbott Roche or Blackhawk;

10

- an email on 3/29/2017 with subject "FW: POD/Blackhawk" including an email thread between Dwyer and CPI employees about pricing for Blackhawk and an attachment containing CPI's quote for Blackhawk titled "Card Production Service Prices"; and
- an email on 3/29/2017 with subject "FW: Updated Events/Tradeshow Tracker" including a 2017 trade show and events schedule and an attachment titled "2017 Sales Events Calendar – Mar 27."

44.     Many of the forwarded documents were marked "CONFIDENTIAL."

45.     Dwyer forwarded at least some of these emails containing CPI confidential business information from his personal email account (mr.j.dwyer@gmail.com) to several MPS employees, including Searfoss and Glinert, as early as May 2017.

46.     On May 18, 2017, Dwyer prepared and forwarded a "strategic plan" presentation containing CPI confidential information to MPS employees, John Searfoss and Ken Glinert.

47.     MPS also assigned Dwyer another MPS email account (john.dwyer@multipkg.com), which he used to communicate on behalf of MPS early as June 6, 2017, 10 days before terminating employment with CPI.

48.     On information and belief, Dwyer visited Searfoss and Glinert at MPS's headquarters in New York on June 6 – 7, 2017.  At that meeting, on information and belief, Dwyer made a presentation to MPS management, including Searfoss and Glinert, using and/or disclosing CPI confidential information and trade secrets in order to explain his business plan for growing MPS's competing business.

49.     On information and belief, Dwyer's proposed business plan for MPS included identifying several of CPI's current and prospective customers as prospective customers for MPS, including Amazon, InComm, NetSpend, Starbucks, and US Bank.

11

50.     On information and belief, Dwyer's first interaction likely occurred well before the January 4, 2017 email. In a pending patent infringement lawsuit between CPS and MPS (Civil Action No. 1:16-CV-02536-MEH), an MPS employee, John Ritter, submitted a declaration in December 2016, stating:

> John Dwyer is an employee at CPI who works at CPI's warehouse facility in Minneapolis. He and others at CPI were ware that MPS' heat seal products were in the CPI warehouse and it is my belief that Mr. Dwyer and others at CPI were also were aware starting in 2013 that MPS was using a "heat seal process" process to package its American Express Target gift cards.

Civil Action No. 1:16-CV-02536-MEH (Dkt. 39-5).

51.     CPI's trade secrets and other confidential business information have been developed through considerable time, effort, and expense in the operation of CPI's business. Further, these trade secrets and other confidential business information are not publicly available and/or cannot be readily duplicated without involving considerable time, effort, or expense.

52.     CPI has taken reasonable steps to identify, protect and preserve the confidentiality of its confidential business information as described in Paragraphs 14 and 15 of this Complaint.

53.     Dwyer improperly acquired CPI's trade secrets and other confidential business information not to serve CPI's business interests but instead for his own gain and, on information and belief, that of his future employer, MPS.

54.     The trade secrets and confidential business information Dwyer misappropriated prior to his resignation for the benefit of MPS consist of the exact categories of information Dwyer would need and use to effectively compete for customers against CPI on behalf of MPS (or another similarly situated CPI competitor).

55.     On July 13, 2017, counsel for CPI sent a letter to Dwyer notifying him that CPI had discovered his improper conduct and demanding that Dwyer return all confidential business

12

information improperly obtained, and that he fully cooperate with CPI's forensic computer consultants with FTI Consulting in order to properly delete and remediate all purloined CPI trade secrets or confidential information from all his electronic devices and cloud based storage where such confidential information may reside; CPI further demanded Dwyer provide a sworn statement disclosing the identities of all persons to whom he forwarded or otherwise disclosed the CPI information he misappropriated.  Exhibit C is a true and correct copy of CPI's letter to Dwyer (with the attached Agreement and Amendment omitted).

56.     Dwyer refused, via counsel, to comply with the demands stated in the July14 letter.  Exhibit D is a true and correct copy of Dwyer's counsel's response.

57.     CPI thus had no choice but to defend its trade secrets by initiating this lawsuit and seeking appropriate injunctive and monetary relief.

## COUNT I
### Misappropriation of Trade Secrets in Violation of Defend Trade Secrets Act
### (18 U.S.C. § 1836 *et seq*.) (Against Dwyer, MPS, Searfoss, and Glinert)

58.     CPI incorporates paragraphs 1-35 and 38-57 by reference.

59.     The documents and other information misappropriated by Dwyer contained significant and critical confidential and proprietary information relating to CPI's business. Such confidential and proprietary information is exclusively CPI's property.

60.     The documents and other information stolen by Dwyer constitute "trade secrets," as defined in 18 U.S.C. § 1839(3), related to products and services used in, or intended for use in, interstate or foreign commerce.

61.     CPI's trade secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by competitors (like MPS) who can obtain economic value from the disclosure or use of the information.

62.     CPI has taken reasonable efforts to protect and maintain the confidentiality of its trade secrets.

63.     CPI has not given express or implied consent to Dwyer to disclose or use CPI's trade secrets as set forth herein.

64.     In violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, Dwyer misappropriated CPI's trade secrets and has refused to return them after termination of his employment.

65.     Dwyer knew or had reason to know that he acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and/or to limit their use (*i.e.*, in the course of his employment by CPI). Dwyer stood in a position of trust to CPI and had contractual and legal duties to refrain from disclosing or using for his benefit, or that of a third party, CPI's trade secrets. These duties arise from the Agreement and were reinforced by the Amendment.

66.     Dwyer, with the intent to convert trade secrets that are related to a service used in or intended for use in interstate or foreign commerce to the economic benefit of CPI, and intending or knowing that the offense will injure CPI knowingly engaged in the following conduct: (a) stole, or without authorization, removed, or by fraud or deception obtained such information; and (b) without authorization copied, duplicated, downloaded, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information to himself and to MPS, including to Searfoss and Glinert.

67.     MPS, Searfoss, and Glinert are and were at all relevant times aware of Dwyer's Agreement and Amendment and the restrictive covenants contained therein, including those requiring Dwyer to keep CPI's confidential information strictly confidential and prohibiting

14

Dwyer from using, disclosing, duplicating, recording, or in any other manner reproducing in whole or in part any confidential information.

68.     On information and belief, MPS, Searfoss, and Glinert purposely targeted Dwyer because of his knowledge of, and relationships with, CPI customers, and his possession of confidential information relating to CPI customers, while he was still employed by CPI.

69.     Dwyer's, MPS', Searfoss', and Glinert's improper acquisition and unauthorized use or disclosure, actual or threatened, violates the DTSA, 18 U.S.C. § 1836 *et seq.*, and was willful and malicious.

70.     As a direct and proximate result of Dwyer's, MPS', Searfoss', and Glinert's wrongful conduct, CPI has suffered irreparable injury. Unless Dwyer, MPS, Searfoss, and Glinert are enjoined from misappropriating, threatening to misappropriate, and/or inevitably disclosing CPI's trade secrets, CPI will suffer irreparable harm for which there is no adequate remedy at law.

71.     CPI is entitled to preliminary and permanent injunctive relief against further misappropriation of trade secrets.

72.     CPI has suffered damages, and continues to be damaged, as a direct result of these actual and threatened breaches which include, but are not limited to, lost profits and attorneys' fees CPI has incurred and will incur to enforce its rights under the DTSA.

## <u>COUNT II</u>
**Misappropriation of Trade Secrets under the Minnesota Uniform Trade Secrets Act (MN. Stat. Ann. § 325C *et seq*.) and Minnesota Common Law (Against Dwyer, MPS, Searfoss, and Glinert)**

73.     CPI incorporates paragraphs 1-35 and 38-57 by reference.

74.     The documents and other information stolen by Dwyer contained significant and critical confidential and proprietary information relating to CPI's business. Such confidential and proprietary information is exclusively CPI's property.

75.     The documents and other information stolen by Dwyer constitutes "trade secrets" as defined in MN. Stat. Ann. § 325C.01(5).

76.     CPI has taken reasonable efforts to protect and maintain the secrecy or confidentiality of its trade secrets, as described above.

77.     CPI has not given express or implied consent to Dwyer to disclose or use CPI's trade secrets.

78.     In violation of the Minnesota Uniform Trade Secrets Act ("MUTSA"), MN. Stat. Ann. § 325C *et seq*., Dwyer misappropriated CPI's trade secrets as set forth above.

79.     Dwyer knew or had reason to know that he acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and/or to limit their use (i.e., in the course of his employment by CPI). Dwyer stood in a position of trust to CPI and had contractual and legal duties to refrain from disclosing or using for his benefit, or that of a third party, CPI's trade secrets. These duties arise from the Agreement and were reinforced by the Amendment.   They also arise at common law from Dwyer's duty of loyalty to CPI.

80.     Dwyer, with the intent to convert trade secrets that are related to a service used in or intended for use in interstate or foreign commerce to the economic benefit of CPI, and intending or knowing that the offense will injure CPI knowingly engaged in the following conduct: (a) stole, or without authorization, removed, or by fraud or deception obtained such information; and (b) without authorization copied, duplicated, downloaded, replicated,

16

transmitted, delivered, sent, mailed, communicated, or conveyed such information to himself and to MPS, including to Searfoss and Glinert.

81.     MPS, Searfoss, and Glinert are and were at all relevant times aware of Dwyer's Agreement and Amendment and the restrictive covenants contained therein, including those requiring Dwyer to keep CPI's confidential information strictly confidential and prohibiting Dwyer from using, disclosing, duplicating, recording, or in any other manner reproducing in whole or in part any confidential information.

82.     On information and belief, MPS, Searfoss, and Glinert purposely targeted Dwyer because of his knowledge of, and relationships with, CPI customers, and his possession of confidential information relating to CPI customers, while he was still employed by CPI.

83.     Dwyer's, MPS', Searfoss', and Glinert's improper acquisition and unauthorized use or disclosure, actual or threatened, violates the MUTSA, Minn. Stat. Ann. § 325C *et seq*., and was willful and malicious.

84.     As a direct and proximate result of Dwyer's, MPS', Searfoss', and Glinert's wrongful conduct, CPI has suffered irreparable injury. Unless Dwyer, MPS, Searfoss, and Glinert are enjoined from misappropriating, threatening to misappropriate, and/or inevitably disclosing CPI's trade secrets, CPI will suffer irreparable harm for which there is no adequate remedy at law.

85.     CPI is entitled to preliminary and permanent injunctive relief against further misappropriation of trade secrets.

86.     CPI has suffered damages, and continues to be damaged, as a direct result of these actual and threatened breaches which include, but are not limited to, lost profits and attorneys' fees CPI has incurred and will incur to enforce its rights under the MUTSA.

## COUNT III
### Breach of the Confidentiality and Nonsolicitation Agreement (Against Dwyer only)

87.     CPI incorporates paragraphs 1-13, 16-35, and 38-57 by reference.

88.     The Agreement and Amendment together form a valid and enforceable contract.

89.     CPI has fully performed every obligation it owed to Dwyer under the Agreement and Amendment.

90.     The Agreement and Amendment require Dwyer to keep CPI's confidential information strictly confidential and prohibits Dwyer from using, disclosing, duplicating, recording, or in any other manner reproducing in whole or in part any confidential information, and not soliciting CPI customers and prospects for which he had any responsibility.

91.     Dwyer breached the Agreement and Amendment by (a) retaining CPI's Confidential Business Information following his termination,   (b) using CPI's Confidential Business Information for purposes other than fulfilling work performed by CPI, and (c) soliciting CPI customers and prospects for which he had responsibility for the benefit of MPS.

92.     Dwyer's breach of the Agreement and Amendment has caused CPI to suffer injury.

93.     Unless Dwyer is preliminarily and permanently enjoined from violating the terms of the Agreement and Amendment, CPI will be irreparably harmed. No adequate remedy at law exists for this breach.

## COUNT IV
### Breach of the Duty of Loyalty (Against Dwyer only)

94.     CPI incorporates paragraphs 1-57 by reference.

95.     By reason of his employment and position with CPI as a Senior Account Executive, Dwyer owed CPI an undivided duty of fidelity and loyalty not to compete with CPI while still employed with it.

96.     While still employed by CPI, Dwyer used MPS email accounts (john.dwyer@multipkg.com) to solicit CPI's current and prospective customers, and otherwise disclosed CPI's confidential business information to MPS, Searfoss and Glinert for the purpose of assisting MPS to compete against CPI and divert customers and prospective from CPI to MPS.

97.     Dwyer's acts breached his duty of loyalty and fidelity to CPI as its employee.

98.     CPI suffered, and will continue to suffer, damages and injury as a result of Dwyer's breach of his duty of loyalty.

## COUNT V
### Tortious Interference with Contract (Against MPS, Searfoss, and Glinert)

99.     CPI incorporates paragraphs 1-57 by reference.

100.    The Agreement and Amendment together form a valid and enforceable contract.

101.    MPS, Searfoss, and Glinert are and were at all relevant times aware of Dwyer's Agreement and Amendment and the restrictive covenants contained therein.

102.    On information and belief, MPS, Searfoss, and Glinert purposely targeted Dwyer because of his knowledge of, and relationships with, CPI customers, and his possession of confidential information relating to CPI customers, while he was still employed by CPI.

103.    MPS, Searfoss, and Glinert intentionally and unjustifiably induced and/or are threatening to induce Dwyer to breach the Agreement and Amendment by, among other wrongful acts, knowingly and intentionally placing Dwyer in a position in which he would violate his confidentiality obligations to CPI.

19

104. As a result of MPS', Searfoss', and Glinert's tortious interference and inducement, Dwyer has breached and will continue to breach the Agreement and Amendment by, among other wrongful acts, using or disclosing CPI's Confidential Business Information learned while in the employ of CPI.

105. CPI has suffered, and will continue to suffer, damages because of MPS', Searfoss', and Glinert's conduct.

106. Unless MPS, Searfoss, and Glinert are preliminarily and permanently enjoined from tortuously interfering with Dwyer's Agreement and Amendment, CPI will be irreparably harmed. No adequate remedy at law exists for this breach.

## COUNT VI
### Unfair Competition (Against MPS only)

107. CPI incorporates paragraphs 1-13 and 16-57 by reference.

108. For its own benefit, MPS engaged in unfair competition against CPI by improperly obtaining, using, and disclosing CPI's confidential information to interfere with CPI's current and prospective business relationships with its customers to unfairly, wrongfully, and unlawfully compete with CPI and to solicit CPI's customers.

109. By misappropriating CPI's confidential information, MPS has gained an unfair competitive advantage over CPI.

110. As a direct and proximate result of MPS' unfair competition, CPI has suffered, and will continue to suffer, damages.

111. MPS has, or will be, unjustly enriched for which CPI seeks disgorgement of any and all profits earned by MPS through their unfair competition.

8461092v1

112.    Unless MPS is preliminarily and permanently enjoined from engaging in unfair competition with CPI, CPI will be irreparably harmed. No adequate remedy at law exists for this breach.

## COUNT VII
### Civil Conspiracy (Against Dwyer, MPS, Searfoss, and Glinert)

113.    CPI incorporates paragraphs 1-57 by reference.

114.    Dwyer, MPS, Searfoss, and Glinert knowingly, intentionally, and recklessly conspired to misappropriate CPI's confidential information and competitive advantages.

115.    Dwyer, MPS, Searfoss, and Glinert knowingly, intentionally, and recklessly conspired to interfere with CPI's current and prospective business relationships and divert customers from CPI to MPS.

116.    As a result of the conspiracy and acts in furtherance of the conspiracy, CPI has suffered, and will continue to suffer, damages.

## PRAYER FOR RELIEF

WHEREFORE, CPI respectfully requests the following relief:

A.    The Court enter an order prohibiting Dwyer, and anyone acting in concert with him, including but not limited to MPS, Searfoss and Glinert from using or disclosing CPI's trade secrets or other confidential business information;

B.    The Court enter an order prohibiting Dwyer, and all those acting in concert with him from otherwise breaching the terms of the Agreement and Amendment;

C.    The Court enter an order requiring Dwyer to immediately return any and all Confidential Business Information, including copies, summaries, or notes made from any item thereof, that came into his possession by reason of his employment with CPI;

21

D.      The Court enter an order requiring Dwyer and MPS to fully cooperate at their expense with CPI's forensic computer consultant in order to locate and properly remediate any and all CPI confidential information stored on any of Dwyer's electronic devices, personal email accounts and/or cloud based storage sites, or in any MPS network or database.

E.      The Court enter an order requiring Dwyer is provide a sworn declaration disclosing whether he has retransmitted or in any manner shared or disclosed CPI confidential information, and if so, to whom, when and what exactly was so disclosed or retransmitted.

F.      The Court require Dwyer to forfeit all of the compensation he received from CPI during the period of time in which he was in breach of the Agreement and otherwise violating his duty of loyalty to CPI;

G.      The Court order MPS, its officers, agents, servants, employees (including Searfoss and Glinert), and attorneys, and those acting in concert with it, from aiding and abetting or causing Dwyer to violate the contractual obligations he owes to CPI as contained in the Agreement and Amendment;

H.      The court award CPI appropriate damages, including compensatory, punitive, and exemplary damages, in amounts to be proved at trial;

I.      The court award CPI the attorneys' fees and costs incurred in prosecuting this action; and

J.      The court award all such further relief as may be appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury upon all the issues to the fullest extent permitted under applicable law.

8461092v1

DATED:  August 25, 2017

**BRIGGS AND MORGAN, P.A.**

By:    */s/ Karen D. McDaniel*
    James J. Long (#190858)
    Karen D. McDaniel (#194554)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone: (612) 977-8400
Fax: (612) 977-8650
jlong@briggs.com
kmcdaniel@briggs.com

**ATTORNEYS FOR PLAINTIFFS**
**CPI CARD GROUP, INC. AND**
**CPI CARD GROUP-MINNESOTA, INC.**

**OF COUNSEL:**
David S. Bloch, Esq.
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email: dbloch@winston.com

William G. Miossi
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006
Telephone: (202) 282-5708
Facsimile: (202) 282-5100
Email: wmiossi@winston.com

**COUNSEL FOR PLAINTIFFS,**
**CPI CARD GROUP, INC. AND**
**CPI CARD GROUP-MINNESOTA, INC.**

8461092v1