# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CPI Card Group, Inc., and
CPI Card Group-Minnesota, Inc.,

                            **Plaintiffs,**

v.

John Dwyer, Multi Packaging
Solutions, Inc., John Searfoss, and
Ken Glinert,

                            **Defendants.**

File No. 17-cv-03983 (SRN/FLN)

**MEMORANDUM OPINION AND ORDER** ~~FILED UNDER SEAL~~

Public Version -- Redacted as Approved by Judge Susan Richard Nelson, 2/20/2018

---

Karen D. McDaniel, James J. Long, and Lisa Colburn, Briggs & Morgan, PA, 80 South 8th Street, Ste. 2200, Minneapolis, MN 55402, for Plaintiffs.

Ryan A. Olson, Richard R. Voelbel, and Scott D. Blake, Felhaber, Larson, Fenlon & Vogt, PA, 220 South Sixth Street, Ste. 2200, Minneapolis, MN 55402 for Defendant John Dwyer.

Brian T. Benkstein, Gina K. Janeiro, and Janet M. Olawsky, Jackson Lewis P.C., 150 South Fifth Street, Ste. 3500, Minneapolis, MN 55402, for Defendants Multi Packaging Solutions, Inc., John Searfoss, and Ken Glinert.

---

SUSAN RICHARD NELSON, United States District Judge

      Currently before the Court are the Motion for a Preliminary Injunction ("Pls.' PI Mot.") [Doc. No. 143] filed on November 7, 2017 by Plaintiffs CPI Card Group, Inc. and CPI Card Group-Minnesota, Inc. (collectively, "CPI" or "Plaintiffs"), and the Motion for Partial Dismissal [Doc. No. 48] filed by Defendants Multi Packaging Solutions, Inc. ("MPS") and John Searfoss ("Searfoss"). For the reasons set forth below, CPI's Motion for

a Preliminary Injunction is granted and MPS and Searfoss's Motion for Partial Dismissal is granted in part and denied in part as detailed herein.

## I.    BACKGROUND

Before CPI filed its Motion for a Preliminary Injunction, the parties engaged in some expedited discovery. In support of their respective positions on the motion, each party submitted evidence, including affidavits, deposition testimony and exhibits. Based on that record, and oral argument held on November 27, 2017, the Court recites below its preliminary findings of fact relevant to this motion. *See Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987) (noting the district court's use of supporting materials, including affidavits and depositions of experts, to rule on the motion for a preliminary injunction). The Court notes, however, that the facts recited herein are not final determinations of disputed matters binding in later stages of litigation. It is a "general rule that 'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

### A. Parties

Plaintiff CPI Card Group, Inc. is incorporated in Delaware and has a principal place of business in Colorado. (Am. Complaint [Doc. No. 11] ¶ 3.) Plaintiff CPI Card Group-Minnesota, Inc. is incorporated in Minnesota and also has its principal place of business here. (*Id.*) CPI asserts that it is a leader in the business of "transaction cards," which include credit and debit cards, prepaid cards, phone cards, rebate or reward cards,

and transit cards. (*see Id.* ¶ 13; *see also* Ex. A of Decl. of Mira Vats-Fournier ("Vats-Fournier Decl.") [Doc. No. 163], Dep. of John Dwyer ("Dwyer Dep.") at A66/14.[1]) In the transaction card industry, cards may be categorized as "open loop" or "closed loop." (Decl. of Margaret O'Leary ("O'Leary Decl.") [Doc. No. 158] ¶ 27.) "Open loop" cards are those which can be used at any location, *e.g.*, Visa or American Express. (*Id.*) In contrast, "closed loop" cards can only be used at a singular retailer, such as Starbucks or Home Depot. (*Id.*) CPI also asserts that it is focused on both closed loop and open loop cards because "[t]here is significant overlap in customers," and the needs of those customers are similar. (*Id.*)

Defendant MPS, which is incorporated in Delaware and has its principal place of business in New York, (Am. Compl. ¶ 5), is also involved in the transaction card industry, (Decl. of Ken Glinert ("Glinert Decl.") [Doc. No. 174] ¶ 4). MPS is a "print and packaging company" and "manufactures and designs folding cartons, labels, rigid packaging, displays, inserts, and transaction cards." (*Id.* ¶ 2.) As part of its transaction card business, MPS also provides closed loop and open loop cards. (*Id.* ¶ 5). MPS and CPI are fierce competitors in what is a very competitive transaction card industry. (O'Leary Decl. ¶ 3.)

---

[1] Throughout this Order, the Court will cite to the depositions found in Exhibit A of the Declaration of Mira Vats-Fournier with the following convention: the ECF page number of the exhibit will be preceded by an "A," followed by a slash and the internal page number of the deposition. For example, the citation associated with this footnote refers to page 14 of Dwyer's deposition found at ECF page number 66 of Exhibit A to the Vats-Fournier Declaration.

Defendants Searfoss and Kenneth Glinert ("Glinert") are currently Senior Vice Presidents of Sales at MPS. (Ex. A of Vats-Fournier Decl., Dep. of John Searfoss ("Searfoss Dep.") at A38/13; *Id.*, Dep. of Kenneth Glinert ("Glinert Dep.") at A3/11.) Searfoss has worked for MPS for approximately one year. (Searfoss Dep. at A37/12.) His position for MPS involves "strategy, operation, and technology." (*Id.* at A38/13.) Glinert has been employed by MPS since approximately 2006 and is currently responsible for transaction card sales. (Glinert Dep. at A3–4/11–13.) Searfoss and Glinert work together building strategies for the technologies that MPS will bring to market in 2018. (Searfoss Dep. at A39/19–20.)

Defendant John Dwyer ("Dwyer") has worked in the transaction card industry since 2004 and currently works for MPS. (Dwyer Dep. at A66/14.) Immediately before that, he worked for CPI for a period of thirteen years. (*Id.* at A66/13.) Although his last day of employment at CPI is heavily disputed,[2] as are many of the events leading up to his resignation, Dwyer voluntarily resigned from CPI in late spring of 2017. (*See* Third Decl. of John Dwyer ("Third Dwyer Decl.") [Doc. No. 170] ¶ 4.) Even before resigning from CPI, however, he signed an employment agreement with MPS. (*Id.* ¶ 3.)

At CPI, Dwyer was a Senior Account Executive. (Dwyer Dep. at A66/15.) In that role, his responsibilities included "managing client relationships, prospecting new clients and customers," as well as heavy involvement in production and servicing of accounts. (*Id.*) While at CPI, Dwyer had a "steady group of base customers," whom Dwyer would

---

[2] See discussion in Section I.E, *infra*.

"call on," or meet with personally, to sell them new and existing transaction card products. (*Id.* at A66–67/16–18.)

At least as related to these clients, Dwyer was exposed to a slew of information which CPI categorizes as CPI confidential. He knew the pricing of the CPI products he sold, as well as the pricing "strategy" for certain products; information that, as "a general rule," Dwyer acknowledges was CPI confidential information. (*Id.* at A67–68/19–22.) In addition to confidential pricing schemes, Dwyer was also exposed to design specifications and strategic plans at CPI, certain aspects of which Dwyer acknowledges were deemed CPI confidential. (*Id.* at A68/24, A69/25.) He was also exposed to information related to revenue and profits as well as information about products in development and not yet released to market—information which Dwyer again understands to have been CPI confidential information. (*Id.* at A69/26–27.)

Now, at MPS, Dwyer's duties are primarily focused on WestRock, the entity that recently purchased MPS. (Third Dwyer Decl. ¶ 14.) These responsibilities include: "serving as a liaison between MPS and WestRock's enterprise group focusing on key enterprise accounts; . . . assessment of potential synergies between MPS and WestRock; retail management and data analytics associated with merchandising displays; and development of new product opportunities focused on connected packaging, consumer promotions, and products focused on the insurance industry; . . . sale activities related to merchandising display sales, and closed-loop product sales with MPS's current customers and prospects in the closed-loop space." (*Id.*) Dwyer maintains that his current job duties "are substantially different" from his prior duties at CPI. (*Id.* ¶ 15.)

5

## B. Dwyer's Employment Agreements with CPI

Because of the confidential nature of many aspects of CPI's business, as well as the heavy competition in the field, CPI protects its confidential and trade secret information, in part, through the use of contractual agreements with its employees. (O'Leary Decl. ¶ 8.) As relevant here, Dwyer signed three such employment agreements: (1) a "Confidentiality and Nonsolicitation Agreement" ("Confidentiality Agreement"), (*see* Am. Compl., Ex. A [Doc. No. 11-1]); (2) an Option Award Agreement ("Option Agreement"), (*see id.*, Ex. B [Doc. No. 11-2]); and (3) a Restricted Stock Unit Agreement ("Unit Agreement"), (*see id.*, Ex. C [Doc. No. 11-3]), (collectively, the "Original Agreements"). Generally speaking, these agreements imposed on Dwyer confidentiality, non-solicitation, and non-compete obligations, as explained below.

### 1. Confidentiality

The confidentiality, or non-disclosure, obligations imposed on Dwyer by the Confidentiality Agreement are quite extensive. The Confidentiality Agreement prohibits Dwyer from misusing or disclosing any CPI confidential information as defined therein. (*See* Confidentiality Agreement ¶¶ 1–2.) Specifically, the agreement prohibits Dwyer, during and after his employment, from using, disclosing, duplicating, recording, or reproducing confidential information "except as ordinarily necessary" for the performance of his work duties or unless CPI expressly directs him to do so. (*Id.* ¶ 2.) These confidentiality obligations are further reinforced by the Option Agreement, which also prohibits Dwyer from disclosing or using CPI confidential information, except as related to and required by Dwyer's performance duties at CPI. (Option Agreement

6

¶ 10(a).) The Option Agreement also tasks Dwyer with safeguarding and protecting CPI confidential information against disclosure, misuse, espionage, loss, and theft. (*Id.*)

### 2. Non-Solicitation

The Original Agreements also imposed non-solicitation obligations on Dwyer. The Confidentiality Agreement prohibited Dwyer—for 1 year following termination of employment—from "directly or indirectly solicit[ing], on [his] own behalf or on behalf of another, (a) any of [CPI's] then-current customers, or (b) any of [CPI's] potential customers for whom [he] had contact or provided services, either directly or indirectly." (Confidentiality Agreement ¶ 7.) This clause covered "products in development, developed, manufactured or sold" by CPI before Dwyer left CPI. (*Id.*)

The Option Agreement's non-solicitation provisions, effective for two years after Dwyer left CPI, prohibited Dwyer from "call[ing] on, solicit[ing] or servic[ing] any customer, supplier, licensee, licensor or other business relation of [CPI] in order to induce or attempt to induce any such [p]erson to cease doing business with [CPI], or in any way interfere with the relationship between" CPI and any of these third parties. (Option Agreement ¶ 10(c).) The Unit Agreement also prohibited Dwyer, *inter alia*, for one year after leaving CPI, from soliciting, among others, customers, former customers, and active prospects of the "Business" of CPI within the "Restricted Territory," as well as from selling products or services for any business that competes with the "Business" of CPI, again within the "Restricted Territory" as defined in the agreement. (Unit Agreement ¶¶ 6(a)(i)(B), (C).)

### 3. Non-Compete

Finally, the Original Agreements also included strict non-compete provisions. The Option Agreement required Dwyer to abstain from working for a competitor for two years after leaving CPI. (*See* Option Agreement ¶ 10(b).) Specifically, this agreement provided that "[Dwyer] shall not, directly or indirectly, either for himself or for or through any other [p]erson, participate in any business or enterprise in a 'Competitive Business,'" a term defined to "include any company, person or entity that is involved in, seeks to become involved in or competes with the Business in the Restricted Territory." (*Id.* ¶ 10(b).) "Business," in turn, is defined through an extensive list of the many aspects of the transaction card industry. (*See id.*)

The Unit Agreement also prohibited Dwyer, for one year after leaving CPI, from "enter[ing] into or engag[ing] in any business that competes with the Business within the Restricted Territory," or "counsel[ing], promot[ing] or assist[ing], financially or otherwise, any person engaged in any business that competes with the Business within the Restricted Territory." (Unit Agreement ¶¶ 6(a)(i)(A), (D).) This agreement again defines the terms "Business" and "Restricted Territory." (*Id.* ¶ 6(b).)

### C. Dwyer Leaves CPI to Work for MPS

Dwyer contends that, at some point, he became frustrated with the compensation plan at CPI and communicated that frustration—and intent to leave CPI if his compensation did not improve—to his supervisor, Margaret O'Leary ("O'Leary"), in January of 2016. (Third Dwyer Decl. ¶ 1.) Dwyer claims that O'Leary told him to "give

her one year to fix the compensation plan," but that the new plan she presented to him more than a year later was, in his view, even worse. (*Id.* ¶¶ 1–2.)

Meanwhile, according to Searfoss, at least by December 2016, "there was word on the street that [Dwyer] was not happy" at CPI. (Searfoss Dep. at A43/33.) At that time, Searfoss approached Dwyer about a position with MPS, (*Id.* at A42/32), and the two began to negotiate Dwyer's eventual employment with MPS, (*see* Ex. A of Vats-Fournier Decl. (Ex. 19 (Dec. 23, 2016 email from Searfoss to Dwyer)) at A200–10.) In February of 2017, Searfoss sent Dwyer the outline of an offer for employment. (*Id.* (Ex. 18 (Feb. 8, 2017 email from Searfoss to Dwyer)) at A197.) At some point, the now-President of MPS, Marc Shore, also became involved in recruiting and hiring Dwyer. (Searfoss Dep. at A43/33–34.) Shore reviewed details of Dwyer's eventual compensation offer as well as the non-compete covenants to which Dwyer was bound before passing the information on to MPS's attorneys for review. (*Id.*) Finally, on March 27, 2017, Dwyer signed an employment agreement with MPS. (*See* Ex. A of Vats-Fournier Decl. (Ex. 20 (MPS-Dwyer Employment Agreement)) at A202–15.) Per the employment agreement, Dwyer was to start work for MPS in April of 2017. (*Id.* at A203.)

On March 29, 2017—two days after he signed his employment agreement with MPS—Dwyer sent O'Leary an email tendering his resignation from CPI. (*Id.* (Ex. 33 (Mar. 29, 2017 email from Dwyer to O'Leary)) at A303.) He did not, however, state that he had already signed an employment agreement with MPS. (*Id.*) Instead, Dwyer represented to O'Leary that he needed to take some time to figure out his future plans, implying he did not have another opportunity already lined up. (*Id.*) Dwyer wrote to

O'Leary, "It is time for me to decide what the next chapter of my career will look like and I am looking forward to taking a little time to figure this out." (*Id.*)

After Dwyer resigned, O'Leary asked him to remain at CPI for a temporary period to assist with transitioning his clients. (O'Leary Decl. ¶ 9; Third Dwyer Decl. ¶ 5.) Dwyer obtained MPS's agreement to postpone his start date, and then agreed to stay at CPI temporarily. (Third Dwyer Decl. ¶¶ 6–7.) Dwyer contends that in exchange for staying on longer, he asked to have certain provisions of the Original Agreements renegotiated and revised. (*Id.* ¶ 6; O'Leary Decl. ¶ 9.) Though the circumstances surrounding the negotiations are heavily disputed, CPI and Dwyer ultimately executed an amendment (the "Amendment") to the Original Agreements, as described below. At no time throughout these negotiations did Dwyer disclose the fact that he had already signed an employment agreement with CPI's competitor MPS.

### D. The Amendment with CPI

On May 12, 2017, Dwyer and CPI signed the Amendment, which made significant changes to Dwyer's non-compete and non-solicitation obligations to CPI. (*See* Am. Compl., Ex. D, Amendment [Doc. No. 11-4].) The Amendment, however, did not alter Dwyer's confidentiality obligations under the Original Agreements. (*See id.*). The Amendment appears to release Dwyer of the non-compete obligations he had under the Original Agreements. In relevant part, the Amendment provides that "Sections 10(b) and (c) of the Option Award Agreement" and "Section[s] 6(i) and (ii) of the Restricted Stock Unit Agreement"—sections imposing *both* non-compete and non-solicitation obligations—"shall be deleted in their entirety and replaced" by narrower non-solicitation

10

provisions—but no non-compete provisions—effective until March 29, 2018. (*See* Amendment ¶¶ 4, 8.)  In relevant part, the replacement non-solicitation language in the Amendment prohibits Dwyer from "directly or indirectly, either for himself or any other [p]erson, solicit[ing]" two categories of CPI clients:

> "(1) clients producing revenue for CPI Holdings, Inc. on or before March 29, 2017 that [Dwyer] directly managed or consulted on in the areas of card fulfillment and eServices, and
>
> (2) clients producing revenue for CPI Card Group – Minnesota, Inc. on or before March 29, 2017 in the business segment of open loop prepaid retail packaging."

(*Id.* ¶ 4(b) (replacing non-compete & non-solicitation provisions of the Option Agreement), ¶ 8 (doing same as to Unit Agreement).) The non-solicitation provision of the Confidentiality Agreement was also replaced by identical language. (*See id.* ¶ 7.) In short, the Amendment appears to remove Dwyer's non-compete obligations under the Original Agreements, leaves unaltered his confidentiality obligations, and significantly narrows his non-solicitation restrictions.

CPI was unaware of Dwyer's employment agreement with MPS while it negotiated the Amendment with Dwyer. (O'Leary Decl. ¶ 9.) In fact, O'Leary states that CPI would never have negotiated the Amendment, or asked Dwyer to continue working for CPI for a transitional period, had Dwyer disclosed that he had already accepted a position with MPS. (*Id.*) MPS, on the other hand, was aware of Dwyer's negotiation of the Amendment, as Dwyer kept MPS closely informed on the progress of negotiations. (*See, e.g.*, Ex. A of Vats-Fournier Decl. (Ex. 39 (May 5, 2017 email thread between Dwyer, Searfoss, and Glinert)) at A346–48.) In fact, the evidence suggests that Dwyer,

Glinert, and Searfoss contemplated steps to keep details about Dwyer's future employment plans hidden from CPI at least until Dwyer signed the Amendment. For instance, on May 5, 2017, Dwyer forwarded to Glinert and Searfoss an email that Dwyer had sent to CPI with his "final offer" for language for the Amendment. (*Id.* at A346.) Glinert responded, "[John Dwyer], if you are pressed for time I would have it signed in current form below as I'm concerned about them pulling the rug out. Better to have closed than no card industry at all." (*Id.*) Glinert was concerned that "rumors are heating up" such that time was "key." (*Id.*) To this, Dwyer responded that "[t]o provide some breathing room," he had asked a friend who worked for a CPI customer to ask O'Leary if that customer could hire Dwyer. (*Id.*) Dwyer stated that his request to his friend was designed "to throw a little smoke." (*Id.*)

Searfoss had a similar exchange with Dwyer. On May 1, 2017, Searfoss texted Dwyer, "Just sat down with Adam DeMalignon and he told me you were coming to work for MPS! He wouldn't tell me who told him but I think Sev knows. I hope you get your document signed before anyone finds this out." (Ex. A of Vats-Fournier Decl. (Ex. 24 (text messages)) at A240, row 1679.) Presumably, the "document" Searfoss referred to was the Amendment.

The Amendment contains apparently contradictory language regarding its effective date. On one hand, the Amendment states that it is "made effective on the 12th day of May, 2017." (Amendment at 2.) On the other hand, it states, "Provided the SATISFYING EVENT defined in Paragraph 3 of this Amendment is met, this Amendment shall become effective on June 17, 2017," but "[i]n the event the

SATISFYING EVENT . . . is not met, this Amendment shall be null and void." (*Id.* ¶ 2.) The "satisfying event" would be met if: (1) "Dwyer w[ould] continue providing services to [CPI] up to and including June 16, 2017"; (2) Dwyer physically reported to work "up to and including May 16, 2017, after which, he w[ould] receive payment for accrued vacation . . . until such accrued vacation is exhausted on or about June 16, 2017"; and (3) between May 13, 2017 and June 16, 2017, inclusive, Dwyer—although not required to physically report to CPI—"w[ould] make himself available by phone, email, or in-person, on an as needed basis to assist in addressing any job-related issues incident to his employment with [CPI]." (*Id.* ¶ 3.)

### E. The Alleged Trade Secret Misappropriation & Violation of Confidentiality, Non-Compete, and Non-Solicitation Obligations

In the months before and after his resignation from CPI, but before officially starting work for MPS,[3] Dwyer engaged in behavior which CPI characterizes as the misappropriation of CPI trade secrets and confidential information and chronic violations of Dwyer's confidentiality, non-compete, and non-solicitation obligations to CPI. (Pls.' Mem. Supp. Mot. Prelim. Inj. ("Pls.' PI Mem.") [Doc. No. 154] at 6–10.) Dwyer and the MPS Defendants heavily dispute these characterizations. (*See* Def. Dwyer Opp'n Mot. Prelim. Inj. ("Dwyer's Opp'n") [Doc. No. 166]; MPS Defs.' Opp'n Mot. Prelim. Inj.

---

[3] Dwyer maintains that his last day of active employment at CPI was May 16, 2017—or the last day he was to physically report to work at CPI per the Amendment. (Third Dwyer Decl. ¶ 11.) CPI, however, maintains that Dwyer's last day of employment at CPI was June 16, 2017, or the last day he was to provide as-needed services to CPI. (Am. Compl. ¶ 4.) It appears to be uncontroverted, however, that Dwyer officially began working with MPS on June 5, 2017. (Third Dwyer Decl. ¶ 14.)

("MPS Defs.' Opp'n") [Doc. No. 172].) Although CPI's contentions are summarized here, the parties' arguments are more fully described in Section II.A, *infra*.

CPI first points to an email entitled "Opportunity" which Dwyer sent to Searfoss on January 9, 2017 while negotiations for Dwyer's employment with MPS were underway. (Ex. A of Vats-Fournier Decl. (Ex. 22 (Decl. of John Searfoss ("Searfoss Decl.") Ex. A)) at A224.) This email described a "fulfillment opportunity" for REDACTED, contained REDACTED's contact information, and included a suggestion by Dwyer to Searfoss that MPS should "get right on this as it could be your foot in the door." (*Id.*) According to CPI, this email constitutes a breach of Dwyer's confidentiality and non-compete obligations under the Original Agreements long before the Amendment. (Pls.' PI Mem. at 6–7.)

Next, CPI points to two emails which Dwyer sent in March of 2017 related to a REDACTED CPI was developing for REDACTED. (*Id.* at 8–9.) On March 10, 2017, Dwyer emailed Searfoss from his personal Gmail account, attaching a document labeled REDACTED," and telling Searfoss: "Check out this patent… REDACTED " (*Id.*; Ex. A of Vats-Fournier Decl. (Ex. 37 (Mar. 10, 2017 email from Dwyer to Searfoss)) at A330.) The patent in question was then under licensing negotiations between REDACTED and CPI—negotiations that Dwyer was in fact spearheading on behalf CPI. (O'Leary Decl. ¶ 19; Dwyer Dep. at A84/85–86.) Then, on March 21, 2017, about a week before resigning from CPI, Dwyer sent another email to Searfoss, telling Searfoss that Dwyer needed to talk to him about a PowerPoint

14

presentation attached to the email titled REDACTED (Ex. A

of Vats-Fournier Decl. (Ex. 40 (March 21 email from Dwyer to Searfoss)) at A349–355.)

Dwyer had apparently received that presentation from a REDACTED after the two

had discussed it the day before. (O'Leary Decl. ¶ 16.) CPI claims that these emails

constitute a breach of Dwyer's confidentiality and non-compete obligations and also

constitute the misappropriation of trade secrets and confidential information, again long

before the Amendment was in effect. (Pls.' Reply Supp. Mot. Prelim. Inj. ("Pls.' PI

Reply") [Doc. No. 184] at 1, 3.)

The next set of evidence that CPI points to is a series of emails that Dwyer

forwarded from his CPI email account to his personal Gmail account on March 29, 2017,

minutes before he emailed his resignation to O'Leary. (Pls.' PI Mem. at 6–7.) These

emails contained attachments to various presentations and CPI documents, many of

which are marked as CPI confidential. (*See* Ex. A of Vats-Fournier Decl. (Exs. 33–36

(March 29 emails from Dwyer to Dwyer)) at A304–29.) Again, CPI contends that Dwyer

misappropriated trade secrets and breached his duty of confidentiality by forwarding

these emails to his personal account. (Pls.' PI Reply at 1–2.)

Finally, CPI points to two PowerPoint presentations that Dwyer prepared and sent

to Searfoss and Glinert on May 18th and June 1st, respectively, while he was still

providing as-needed services to CPI. (Pls.' PI Mem. at 7.) Dwyer first forwarded these

presentations from his CPI email account to his personal Gmail account, and then within

a few minutes forwarded those same presentations to Searfoss and Glinert from Gmail.

(*Compare* Ex. A of Vats-Fournier Decl. (Ex. 7 (May 18 email from Dwyer to Dwyer)) at

15

A133–37, *and id.* (Ex. 10 (June 1 email from Dwyer to Dwyer)) at A146–57, *with id.* (Ex. 8 (May 18 email from Dwyer to Searfoss and Glinert)) at A138–42, *and id.* (Ex. 11 (June 1 email from Dwyer to Searfoss and Glinert)) at A158–77.)  CPI contends that these presentations include CPI trade secrets and confidential information, as well as information on CPI products not yet released to market. (O'Leary Decl. ¶¶ 14–15.)

### F.  Forensic Investigation and Procedural Posture

At some point after these events, CPI conducted a forensic examination of Dwyer's CPI email account and learned about the emails Dwyer had forwarded to his personal Gmail account, including the May 18th and June 1st emails. (Am. Compl., Ex. E (litigation hold letter from CPI to Dwyer) [Doc. No. 11-5] at 2.) On July 13, 2017, the law firm of Winston & Straw ("Winston"), then counsel for CPI, sent Dwyer a litigation hold letter. (*Id.*) This letter also demanded that Dwyer cooperate with CPI's computer forensic vendor, FTI Consulting ("FTI"), "to accomplish removal and remediation of all electronic copies of CPI's materials from all [his] personal electronic devices, email accounts, external drives and cloud based storage sites where they may reside." (*Id*. at 2, 4.)

On July 18, the law firm of Kramer Levin, who was then representing Dwyer, responded to Winston's demand letter. (Am. Compl., Ex. F (Dwyer response to litigation hold letter) [Doc. No. 11-6] at 18.) A few days later, the parties began an email discussion and reached an agreement (the "ESI Agreement") pursuant to which FTI would locate and forensically remove CPI's materials from Dwyer's personal electronic devices, email accounts, external drives, and cloud-based storage devices.  (Dwyer's

16

Opp'n at 8.) FTI conducted this forensic examination and deleted CPI-related information and documents from Dwyer's devices. (*Id.*)

Following the FTI forensic examination, attempts between the parties to reach an out-of-court resolution broke down, and on August 25, 2017, local counsel Briggs and Morgan ("Briggs") initiated this lawsuit on behalf of CPI, alleging claims against Dwyer, MPS, Searfoss, and Glinert.[4] (Compl. [Doc. No. 1].)[5] On September 15, 2017, Dwyer filed a Motion to Disqualify CPI's counsel [Doc. No. 27]. Dwyer argued that both Winston and Briggs should be disqualified from representing CPI because they had deliberately breached the parties' ESI Agreement, intentionally reviewed attorney-client privileged information, and violated the Minnesota Rules of Professional Conduct. (*See* Dwyer's Mem. Supp. Mot. Disqualify Pls.' Counsel [Doc No. 29] at 1.) A hearing date before the magistrate judge was set for October 2, 2017. (Sept. 21, 2017 Order [Doc. No. 54].)

Meanwhile, on September 21, 2017, both sides filed motions before this Court. Defendants MPS and Searfoss moved to dismiss two counts of the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). (*See* MPS and Searfoss Mot. Partial. Dismissal.) First, MPS and Searfoss urge the Court to dismiss

---

[4] The Court will refer to MPS, Searfoss, and Glinert collectively as the "MPS Defendants." "Defendants," in turn, will refer to these defendants plus Dwyer.

[5] On September 8, CPI filed the Amended Complaint, now the operative complaint in this litigation. (*See* Am. Compl.)

CPI's claim for Fraudulent Inducement of the Amendment as against the two of them,[6]

arguing that the claim does not meet the heightened pleading requirement under Rule

9(b). (MPS and Searfoss Mem. Supp. Partial Dismissal ("MPS and Searfoss Dismissal

Mem.") [Doc. No. 50] at 1, 5–8.) Second, MPS and Searfoss ask this Court to dismiss

CPI's claim for Unfair Competition, (*see* Am. Compl. ¶¶ 173–78 (Count IX)), for failure

to state a claim, (MPS and Searfoss Dismissal Mem. at 1–2, 8–10).

    For its part, CPI moved for a preliminary injunction [Doc. No. 55]. Winston alone

submitted and signed CPI's motion, (*see id.* at 4), and it alone signed CPI's memorandum

in opposition to the Motion for Partial Dismissal filed by MPS and Searfoss.

    On October 27, 2017, Magistrate Judge Franklin L. Noel issued an Order

disqualifying Winston—but not Briggs—from representing CPI. (*See* Oct. 27, 2017

Magistrate Judge Order ("MJ Order") [Doc. No. 124].)[7] In light of the magistrate judge's

order disqualifying Winston, this Court ordered that Winston withdraw CPI's motion for

a preliminary injunction. (*See* Oct. 30, 2017 Order [Doc. No. 132].) Given the magistrate

judge's finding of no impropriety by Briggs, this Court permitted Briggs to file a new

motion for a preliminary injunction on behalf of CPI—cured of any impropriety—and

---

[6] The Amended Complaint does not assert Count III against Glinert. (*See* Am. Compl. ¶¶ 117–22.)

[7] Magistrate Judge Noel found that Winston had improperly reviewed and used confidential and attorney-client privileged information belonging to Dwyer. (MJ Order at 7–12.) He found Winston's conduct prejudicial to the administration of justice and in violation of the Minnesota Rules of Professional Conduct, warranting disqualification as CPI's counsel. (*Id.* at 12.) However, Magistrate Judge Noel found that the conduct of Briggs did not merit disqualification. (*Id.*)

directed CPI to re-file a response to MPS and Searfoss's Motion for Partial Dismissal. (*See* Min. Entry for Nov. 2, 2017 Teleconference [Doc. No. 136].)

On November 7, 2017, Briggs filed the instant Motion for a Preliminary Injunction on behalf of CPI [Doc. No. 143]. CPI urges the Court to enjoin all Defendants from "deliberate and extensive misappropriation of CPI's trade secrets and other confidential business information." (Pls.' PI Mot. at 1.) CPI further seeks to enjoin Dwyer from working, directly or indirectly, in MPS's transaction card industry during the pendency of this lawsuit. (CPI Proposed Order [Doc. No. 152] at 2.) Finally, CPI seeks the return of any of its confidential, proprietary, or trade secret information that may still be in Defendants' possession. (*Id.* at 3.)

CPI contends that it has and will continue to suffer irreparable harm if Defendants are not enjoined. (Pls.' PI Mem. at 12–18.) It also argues that it is likely to succeed on the merits of at least seven of its claims: Counts I and II, Misappropriation of Trade Secrets in violation of federal and state law (asserted against all Defendants), (*see id.* at 19–22); Count III, Fraudulent Inducement of the Amendment (asserted against Dwyer, Searfoss, and MPS), (*see id.* at 23–25); Counts IV–VI, Breach of the Non-Disclosure, Non-Competition, and Non-Solicitation Covenants in the Original Agreements, respectively (asserted against Dwyer), (*see id.* at 22–25); and Count VIII, Tortious Interference with Contract (asserted against the MPS Defendants), (*see id.* at 26–28). On November 17, Briggs also filed a new response on behalf of CPI opposing MPS and Searfoss's Motion for Partial Dismissal. (Pls.' Opp'n Partial Dismissal [Doc. No. 165].) The Court now turns to the parties' respective motions.

## II.    DISCUSSION

### A.  Preliminary Injunction

#### 1.  Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This Court must consider four factors to determine whether preliminary injunctive relief is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *accord Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (quoting *Dataphase*). When applying these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)). A plaintiff "is entitled to a preliminary injunction only if the *Dataphase* factors, on balance, weigh in [his] favor." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 499 (8th Cir. 2013) (citing *Dataphase*, 640 F.2d at 113). The burden of establishing the four factors lies with the party seeking injunctive relief. *Watkins*, 346 F.3d at 844.

#### 2.  Likelihood of Success on the Merits

"An injunction cannot issue if there is no chance on the merits." *Mid-Am. Real Estate Co. v. Ia. Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005). However, the question is not

whether the movant has "prove[d] a greater than fifty percent likelihood that [it] will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation," *Watkins*, 346 F.3d at 844. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143. Rather, this factor simply requires the movant to show that it has a "fair chance of prevailing" on its claims. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Moreover, "[w]hile no single [*Dataphase*] factor is determinative, the probability of success factor is the most significant." *Home Instead*, 721 F.3d at 497 (quotation marks and internal citations omitted). To satisfy this factor, the movant need only show likelihood of success on the merits on a single cause of action, not every action it asserts in its complaint. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002).

### a.    Misappropriation of CPI Trade Secrets (All Defendants)

CPI first argues that it is likely to succeed on its claims of misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, as well as the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. § 325C *et seq.*, and Minnesota common law. (Pls.' PI Mem. at 19–22.) To ultimately prevail on a misappropriation claim under these statutes, CPI must show both the "existence and the misappropriation of a trade secret." *Wilson v. Corning, Inc.*, 171 F. Supp. 3d 869, 882 (D. Minn. 2016) (citations omitted); *Katch, LLC, v. Sweetser*, 143 F. Supp. 3d 854, 868 (D. Minn. 2015) (citations omitted).

A "trade secret" is defined in both the DTSA and the MUTSA as "information" that "(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 899 (8th Cir. 2005) (citing Minn. Stat. § 325C.01, subdiv. 5); *see* 18 U.S.C. § 1839(3). "Misappropriation," in turn, is defined as the "acquisition," "disclosure," or "use" of another's trade secrets by "improper means." *See* Minn. Stat. § 325C.01, subdiv. 3; 18 U.S.C. § 1839(5). The MUTSA defines improper means as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Minn. Stat. § 325C.01, subdiv. 2. The definition of misappropriation under the DTSA is, almost verbatim, the same. *See* 18 U.S.C. § 1839(5).

CPI points to three major categories of information which it claims are trade secrets that were misappropriated by Dwyer and the MPS Defendants. Each is addressed in turn.

### i.    March Emails Relating to the ███████ Solution

CPI argues that all Defendants are liable for trade secret misappropriation because of two emails Dwyer sent to Searfoss on March 10 and 21 containing details of a ███████ ████████ that CPI was developing for ██████ (Pls.' PI Mem. at 8–10, 21.) The March 10th email, titled ███████ included a CPI patent then under licensing negotiations between CPI and ██████—negotiations that Dwyer was spearheading on behalf of CPI. (Ex. A of Vats-Fournier Decl. (Ex. 37 (Mar. 10, 2017 email from Dwyer

to Searfoss)) at A330.) In the email, Dwyer stated to Searfoss that the idea was gaining traction at **REDACTED**. The March 21st email included the PowerPoint presentation titled **REDACTED** (*id.* (Ex. 40 (March 21 email from Dwyer to Searfoss)) at A349–355), which Dwyer received directly from a **REDACTED**.

In essence, CPI argues that the **REDACTED** reflected in the **REDACTED** PowerPoint presentation is a trade secret because it was unknown to MPS at that time and CPI has not released the solution to market yet. (*See* Pls.' PI Mem. at 9–10, 21.) CPI then argues that it was misappropriation because Dwyer and Searfoss discussed it, with Searfoss testifying that the nature of those discussions were "[t]hat **REDACTED** was negotiating a licensing agreement with CPI to use this methodology, and [Dwyer] wanted to know if we were capable of doing it." (Searfoss Dep. at A46/47.)

Here, although the issue is close, and further evidence may persuade the Court otherwise, the Court concludes that CPI has not demonstrated a fair chance of ultimately showing that the information contained in these emails is protectable as a trade secret. Although CPI's potential solution for any given customer likely has actual or potential economic value to a competitor before that solution is released to market, CPI must still meet the final element of a trade secret—that it made "efforts that are reasonable under the circumstances to maintain its secrecy." Minn. Stat. § 325C.01, subdiv. 5. That, CPI has failed to do.

Beyond stating that it considers "**REDACTED** interest in [CPI's] patent and CPI and **REDACTED** development of an application to use CPI's patent and the specific solution developed at CPI for **REDACTED** to be CPI confidential information,"

(O'Leary Decl. ¶ 19), and generally pointing to the measures it takes to protect confidential information, (*see generally* Decl. of Jay Arbabha [Doc. No. 146]), CPI has not shown a likelihood of proving that it took reasonable measures to protect the secrecy of the contents of *this* particular presentation. *See Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 901 (Minn. 1983) (explaining that "more than an 'intention'" to keep something secret is required). Critically, this presentation was created by REDACTED, not CPI. And so far as the Court can discern, it was not marked "CPI Confidential" or "confidential" at all. Though "[s]ecrecy need not be total," CPI has not shown that it took reasonable steps to "keep[] the information from those outside in the general trade or industry." *Jostens, Inc. v. Nat'l Comput. Sys., Inc.*, 318 N.W.2d 691, 700 (Minn. 1982). In fact, Searfoss testified that at some point, perhaps after Dwyer shared the presentation with him, although he could not recall the specific timing, REDACTED itself shared the CPI solution with MPS. (Searfoss Dep. A46–47/48–49; Third Dwyer Decl. ¶ 25 ("This information was distributed to REDACTED vendor base, including to MPS. The document does not contain any confidential information of CPI, which makes sense given that CPI was not a REDACTED client at the time.").)

Although Dwyer's transmission of this information to MPS without even sending it to O'Leary, and MPS's willingness to capitalize on this information while Dwyer was still employed by CPI, strikes the Court as wrongful and is likely actionable on other grounds, "[w]ithout a proven trade secret[,] there can be no action for misappropriation, even if defendants' actions were wrongful." *Electro-Craft*, 332 N.W.2d at 897. Otherwise, courts

"would come dangerously close to expanding the trade secrets act into a catchall for industrial torts." *Id.*

### ii.    Forwarded Emails

Next, CPI contends that Dwyer is liable for trade secret misappropriation because he forwarded to his personal Gmail account, minutes before resigning, a series of emails with information clearly marked CPI confidential. (PIs.' PI Mem. at 6–7.) In response, Dwyer contends that these emails do not constitute trade secrets, and that regardless, there was no misappropriation because he did not forward the emails to CPI and his intent in retaining that information was benign. (Dwyer's Opp'n at 20–21; Third Dwyer Decl. ¶ 18.) He contends that he forwarded these emails to his personal account "in case clients and/or service teams needed answers regarding on-going projects after [he] resigned, as [he] did not know whether [he] would continue to work during the two-week notice period." (Third Dwyer Decl. ¶ 18.)

Here, the Court again concludes that CPI has not shown a fair chance of prevailing on this claim, at this time, on this record. At the outset, the Court notes that CPI does not sufficiently identify why the information contained in these emails qualifies as a trade secret. CPI generalizes that all the information at issue "constitutes CPI trade secrets and confidential information" because "[t]his is the type of information from which a competitor could derive advantage because it has actual or potential economic value," and because it "is information which CPI takes steps to protect as confidential." (O'Leary Decl. ¶ 20.) But generalized assertions and "cursory descriptions" do not meet CPI's burden of showing that legitimate trade secrets are at stake. *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d

983, 995 (D. Minn. 2013); *Guy Carpenter & Co., Inc. v. John B. Collins & Assocs., Inc.*, No. 05-cv-1623 (JRT/FLN), 2006 WL 2502232, at *2 (D. Minn. Aug. 29, 2006) ("Carpenter's failure to identify trade secrets with specificity renders the Court powerless to enforce a trade secret claim.") Although the documents Dwyer forwarded were in fact marked "CPI Confidential," information that an employer marks as "confidential" is not automatically or even necessarily "trade secret" information. *See Katch*, 143 F.Supp. 3d at 868. Rather, a company's classification of its documents as "confidential" may be but one factor courts consider to assess whether information is protectable as a trade secret. *See Jostens*, 318 N.W.2d at 700–01 (affirming as not clearly erroneous trial court's finding that no trade secret existed where information was not marked "confidential" until after litigation began).

But even if this Court concluded that CPI is likely to establish that these emails contained trade secrets, CPI still faces an uphill battle to demonstrate that Dwyer or MPS misappropriated them. Although the Court questions Dwyer's candor in claiming that he forwarded these emails to himself for the benefit of CPI's customers, CPI has not presented any evidence showing that Dwyer forwarded these emails to MPS or otherwise personally used the information in a manner that is likely to constitute "misappropriation" under the applicable statutes. Absent evidence of use or disclosure, CPI would need to show "acquisition" by "improper means," again defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage . . . ." Minn. Stat. § 325C.01, subdiv. 2. Notably, Dwyer's Confidentiality Agreement did not *per se* prohibit him from forwarding emails to his personal email

account. And absent this express prohibition—or again evidence of use or disclosure—the Court is hard-pressed to conclude that Dwyer's behavior falls under the definition of "improper means." *See id.*

### iii. "Strategic Plan" & "Market Opportunities" Presentations

Finally, CPI alleges that Dwyer misappropriated trade secrets by sending two presentations to Searfoss and Glinert on May 18 and June 1 which it claims "focused on soliciting CPI customers, and included reference to a number of CPI trade secrets, including products not yet released to market by CPI and information relating to technology on which CPI is seeking a patent."[8] (Pls.' PI Mem. at 20–21.) As to Searfoss and Glinert, CPI argues that they too are liable for misappropriation because they understood Dwyer had confidentiality and non-competition obligations to CPI and nevertheless received, reviewed, or and/or used the information contained in the two presentations. (*Id.* at 7, 20–21.)

This time, CPI points out specific information contained in the presentations that it contends is protectable as a trade secret. First, REDACTED

According to O'Leary, REDACTED

Second, CPI contends that the presentation also references the REDACTED

---

[8] So far as the Court can discern, the June 1st presentation duplicates some of the content of the May 18th presentation and adds additional content. Because CPI focuses its arguments on the contents of Exhibit 11, the June 1st presentation, so does the Court.

REDACTED

and reiterates that this is a form of fraud control that REDACTED CPI are implementing—based on CPI's patent—and which has not been released to the market yet, (O'Leary Decl. ¶ 14). Next, CPI claims that the presentation's mention of REDACTED technology, (*see* Ex. A of Vats-Fournier Decl. (Ex. 11 (June 1 email from Dwyer to Searfoss and Glinert - presentation)) at A163), is a reference to "another concept [that] CPI is working on that has not been rolled out to the market and will not be until February, 2018," and of which Dwyer was aware while at CPI, (O'Leary Decl. ¶ 14). Finally, CPI contends that the presentation's reference to a REDACTED

REDACTED is again a reference to CPI's technology for which it is currently in the process of securing a patent, (O'Leary Decl. ¶ 14).

Dwyer vigorously disputes CPI's characterization of the contents of the presentation. (*See* Dwyer's Opp'n at 21–22.) He claims that the items he referenced in the PowerPoint are not CPI trade secrets, but rather "common industry buzz words," (*id.* at 22), and that the presentation as a whole simply contained his ideas and "was a personal business plan [he] created in anticipation of [his] employment with MPS," (Third Dwyer Decl. ¶ 20). Specifically, with respect REDACTED , Dwyer states that this general concept is not proprietary to CPI. (Dwyer Dep. at A83/82.) In fact, he claims that he first learned of the concept from someone other than CPI, and that CPI in fact copied it. (*Id.*) He further states that to his understanding, the concept is actually covered under a patent

belonging to ███████████ Next, Dwyer again argues that the ████ ████ ████████████ is proprietary to █████ not CPI, and that it was provided to many of ███████ suppliers. (Dwyer Dep. at A83/84.) As to ██████████ technology, although he acknowledges that during his time at CPI he was exposed to CPI technology in this realm, Dwyer claims that "[v]irtual cards are relatively common in the marketplace," (*id.* at A86/93–96), and that, in fact, CPI's former CEO regularly mentioned the concept on calls with analysts, (Dwyer Decl. ¶ 23). Finally, Dwyer contends that with respect to ██████ ██████████████, up until his departure from CPI, he was not aware of the ██████████ To the contrary, he claims that MPS was "an attractive destination" in part because it had developed new technology ███████████

On these facts, and without a fuller record, the Court again is unable to conclude that CPI has met its burden of establishing a fair chance of success on the merits because Dwyer has presented sufficient evidence to call into question CPI's contention that the presentation disclosed CPI trade secrets. Based on Dwyer's sworn testimony, buttressed in part by the testimony of Searfoss and Glinert, the Court is not yet convinced that the concepts mentioned in the presentation were not "generally known to" others in the industry. *See* Minn. Stat. § 325C.01, subdiv. 5. It is well established that information which is generally known to the public or within an industry, or is readily ascertainable, is not a trade secret. *Lexis–Nexis v. Beer*, 41 F. Supp. 2d 950, 958 (D. Minn. 1999). Moreover, "information that comprises general skills and knowledge acquired in the course of employment, do[es] not constitute trade secrets." *Guy Carpenter*, 2006 WL 2502232, at *2.

Here, in addition to Dwyer's contentions, Glinert testified that he had some intellectual property related to REDACTED ████████████████████ ████████████████████████ Similarly, Searfoss testified that he is familiar with the concept of REDACTED ████████████ ████████████████████████ REDACTED ████████████████ Given the limited and conflicting testimony, the Court is unable to conclude at this time that CPI is likely to succeed on the merits of this claim. *See Lexis–Nexis*, 41 F. Supp. 2d at 959 (denying injunctive relief given the "contradictory nature of the evidence"); *see also Cannon Servs., Inc. v. Culhane*, No. 04-cv-1597 (ADM/AJB), 2004 WL 950414, at *3 (D. Minn. Apr. 30, 2004) ("Such circumstances present a classic dispute of material fact that precludes finding a decisive likelihood of success by Plaintiffs."). [9]

In sum, for the purposes of this motion, the Court concludes that CPI has not met its burden of establishing a fair chance of success on the merits on its trade secret misappropriation claim. Nevertheless, as discussed *infra* and as set out in Section III of this Order, because CPI meets its burden of proof with respect to its breach of contract claims against Dwyer, he is enjoined from disclosing, utilizing, or in any way discussing with MPS or others any of the aforementioned technology so far as he knows or has reason to know

---

[9] The Court underscores that it is not making final factual findings as to the evidence on this claim. In addition to the evidence described above, there abounds plenty of evidence that calls into question the arguments of all parties. But given the extraordinary nature of preliminary injunctions, "in weighing an application for a preliminary injunction, to doubt is to deny." *Evening News Pub. Co. v. Allied Newspaper Carriers of N. J.*, 149 F. Supp. 460, 463 (D.N.J. 1957) (citations omitted).

that it is CPI confidential and proprietary information. *See Luigino's, Inc. v. Peterson*, 2002 WL 122389, at *8 (D. Minn. Jan. 28, 2002) (explaining that Plaintiff's claims of breach of contract may provide the appropriate avenue for remedy where confidential information is not protectable as a trade secret); *see also Jostens*, 318 N.W.2d at 701 (explaining that "employees have a common-law duty not to wrongfully use confidential information or trade secret obtained from an employer," and that confidential information "which would be unfair for the employee to use elsewhere, is deemed confidential and is not to be disclosed or used.")

### b.    Breach of Confidentiality Agreement (Dwyer)[10]

To ultimately prevail on a breach-of-contract claim under Minnesota law, a plaintiff must demonstrate the "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."[11] *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)). The parties do not appear to dispute that the first two elements are met here, so this Court focuses on the third. *See Sip-Top, Inc. v. Ekco Grp., Inc.*, 86 F.3d 827, 831 (8th Cir. 1996).

---

[10] Although CPI also claims that Dwyer breached the non-disclosure provisions of the Option Agreement, (Am. Compl. ¶¶ 123–133 (Count IV)), for ease of analysis, the Court will focus only on the Confidentiality Agreement.

[11] The Confidentiality Agreement provides that it "shall be construed and interpreted according to the laws of the State of Minnesota." (Confidentiality Agreement ¶ 13.)

Here, CPI has clearly shown that Dwyer likely violated the confidentiality provisions of the Confidentiality Agreement on numerous occasions. The agreement prohibits Dwyer, during and after his employment, from using, disclosing, duplicating, recording, or reproducing confidential information that he "learn[ed] or acquire[d] during [his] employment except as ordinarily necessary for [him] to perform [his] assigned duties on behalf of [CPI] or unless [CPI] expressly directs [him] to do so." (Confidentiality Agreement ¶ 2.a.) It further provides that Dwyer would "treat information as confidential when it is labeled "confidential" or 'trade secret,'" or "if, under the circumstances, [he] know[s] or ha[s] reason to know that [CPI] intends to keep that type of information confidential." (*Id.* ¶ 2.b.) Confidential information, in turn, is defined to mean:

> [A]ny information not generally known in CPI Card Group's business or readily ascertainable by proper means by others, including CPI Card Group competitors . . . , and includes trade secrets. It includes . . . the names of CPI Card Group . . . customers and suppliers and the nature of CPI Card Group's relationships with them, for example, types and amounts of products acquired from or supplied to CPI Card Group. It includes information about CPI Card Group processes and products, including information relating to its research, development, manufacturing, engineering, marketing, and selling.

(*Id.* ¶ 1.)

Beginning with at least the email that Dwyer sent to Searfoss on January 9, 2017, Dwyer likely breached the Confidentiality Agreement. This email contained details of a fulfillment opportunity for REDACTED and included REDACTED contact information. Although Dwyer contends that he believed that CPI could not perform the opportunity and that he contacted MPS per the industry practice of "sharing leads," (Third Dwyer Decl. ¶ 19), the names of CPI clients and the nature of CPI's

relationship with them is clearly confidential information under the Confidentiality Agreement. Moreover, Dwyer presents no evidence that he needed to share this information to perform his CPI duties nor that O'Leary expressly authorized him to share details of one of its largest customers with a direct competitor. (*See* O'Leary Decl. ¶ 13.)

Next, Dwyer also likely violated the Confidentiality Agreement by forwarding CPI confidential information from his CPI email to his personal Gmail account minutes before he resigned from CPI. While it is true that the Confidentiality Agreement did not expressly prohibit Dwyer from forwarding emails to himself, it did prohibit Dwyer from taking action as to confidential information "except as ordinarily necessary" to perform his job duties. (Confidentiality Agreement ¶ 2.a.) Given Dwyer's plan to resign less than ten minutes later, it is unlikely he forwarded those emails without nefarious intent, *i.e.*, to fulfill any remaining performance duties at CPI.

Finally, Dwyer also likely violated the terms of the agreement by sending, prior to his resignation, details of the REDACTED that CPI was developing in conjunction with REDACTED. Again, the Confidentiality Agreement expressly states that CPI considers the nature of CPI's relationship with its clients to be confidential.

### c.    Breach of Option Agreement & Unit Agreement (Dwyer)

CPI next argues that it is likely to succeed on the merits of its claim that Dwyer breached his non-compete and non-solicitation duties under the Original Agreements. (*See* Pls.' PI Mem. at 23–25.) CPI also contends that it is likely to show that those agreements remain operative because Dwyer procured the Amendment through fraud, rendering the Amendment null and void. Although, as explained below, the Court finds that Dwyer likely

33

breached his duties under the Option Agreement and the Unit Agreement even before the Amendment was signed, because of the relief sought by CPI, the Court finds it necessary to reach the issue of whether the Amendment is likely null and void.

At the outset, however, although not briefed by the parties, the Court must address the choice-of-law provision contained in the Option and the Unit Agreements. The Option Agreement provides that it "will be construed and enforced in accordance with, and governed by, the laws of the State of Delaware . . . ." (Option Agreement ¶ 19.) The Unit Agreement contains similar language. (Unit Agreement ¶ 15(f).) A federal court exercising supplemental jurisdiction over state law claims in a federal question action must apply the substantive law of the forum state, including its choice-of-law rules. *See MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co.*, 197 F. 3d 1276, 1282 (9th Cir. 1999) ("In a federal question action where the federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state . . . ." (quoting *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996))).

Minnesota generally enforces choice of law provisions, applying the substantive law agreed to by the parties. *See Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007); *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n.1 (Minn. 1980). In some cases, contractual choice of law provisions also govern tort claims related to the contract:

> Where a plaintiff's tort claims are closely related to the interpretation of the contract and fall within the ambit of the express agreement, those tort claims are also properly subject to the contract's choice of law clause. In

other words, under Minnesota law, if analysis of the claims connected to a contract involves interpretation of the contract, then the forum will apply the contractual choice-of-law provisions to the tort claims.

*Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1031–32 (D. Minn. 2013). (quotations and citations omitted).

In this instance, CPI's claim that the Amendment was procured by fraud is unrelated to the interpretation of the Option and Unit Agreements, and this Court will thus apply Minnesota law. To succeed on its fraud claim in Minnesota, CPI must ultimately prove: "(1) a false representation by [Dwyer] of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [CPI] to act in reliance thereon; (4) that the representation caused [CPI] to act in reliance thereon; and (5) that [CPI] suffered pecuniary damages as a result of the reliance." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).[12]

Here, the Court agrees with CPI that it has a fair chance of prevailing on its fraud claim against Dwyer.[13] In his resignation email, by stating that "it [was] time for [him] to

---

[12] In any event, Delaware law on this fraud claim is substantially the same. In Delaware, to prevail in a claim for fraud, a plaintiff must show: "1) a false representation, usually one of fact . . . ; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance." *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quoting *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)).

[13] The Court reaches this conclusion as to Dwyer only, and does not address CPI's fraud claim against MPS and Searfoss. As to MPS and Searfoss, this claim is dismissed without prejudice as discussed in Section II.B.2, *infra*.

decide what the next chapter of [his] career will look like" and that he was "looking forward to taking a little time to figure this out," (Ex. A of Vats-Fournier Decl. (Ex. 33 (Mar. 29, 2017 email from Dwyer to O'Leary)) at A303), Dwyer falsely represented to O'Leary that he did not have another job. Dwyer's claims that "[he] never told Ms. O'Leary that [he] did not have another job," (Third Dwyer Decl. ¶ 9), is a strained interpretation of the facts. Moreover, Dwyer likely made this and other misrepresentations with the intent to induce reliance on the part of CPI. Dwyer makes much of the fact that his email to O'Leary came before they began negotiating the Amendment—thus negating any reliance claim—but his resignation email suggests that Dwyer already anticipated potentially staying on at CPI for a transitional period. In his resignation email, he also stated to O'Leary, "I spoke to Lisa about the possibility of staying around longer, and she thinks that if this is good for our clients and for CPI, then it should be an option." (Ex. A of Vats-Fournier Decl. (Ex. 33 (Mar. 29, 2017 email from Dwyer to O'Leary)) at A303.)

But more importantly, there is additional evidence to suggest that up until the date when the parties signed the Amendment (May 12), Dwyer maintained an intent to mislead CPI so that negotiations could continue. As just one example, responding to Glinert's concern that CPI could "pull[] the rug out" on the Amendment, Dwyer responded that "[t]o provide more breathing room," and to "throw a little smoke," he asked a friend of his who worked for a CPI customer to ask O'Leary if the *customer* could hire him, knowing full well he already had another job with MPS. (Ex. A of Vats-Fournier Decl. (Ex. 39 (May 5, 2017 email thread between Dwyer, Searfoss, and Glinert)) at A346; *see* O'Leary Decl. ¶ 22.) And Dwyer was successful in inducing reliance, as O'Leary states that had CPI known that

Dwyer had accepted employment with MPS, CPI would have terminated him, would not have asked him to stay for a transitional period, or amended the Original Agreements. (O'Leary Decl. ¶ 9.) In short, the Court concludes that CPI has shown a fair chance of prevailing on its fraud claim against Dwyer.

Next, the Court also concludes that CPI is likely to prevail on its claim that Dwyer breached the non-compete and non-solicitation provisions of the Option and the Unit Agreements even before the Amendment was signed. In this instance, the Court will apply Delaware law to CPI's breach of contract claims because they are governed by the choice of law provision in the agreements.

Under Delaware law, a party moving for injunctive relief based on a breach of restrictive covenants must show evidence of a breach and the enforceability of the covenants. *See TP Group–CI, Inc. v. Vetecnik*, No. 1:16-CV-00623-RGA, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016). Here, CPI has presented ample evidence that Dwyer breached the non-compete and non-solicitation provisions of the Option and Unit Agreements. Without reiterating points already thoroughly discussed, Dwyer likely violated the non-solicitation and non-compete covenants of the agreements at least by: (1) sending REDACTED information to MPS, stating it could be MPS's foot in the door; (2) telling MPS that CPI's patent was gaining traction at REDACTED ; and (3) sending to MPS—but not O'Leary—the PowerPoint presentation that he received from REDACTED in March before his resignation. This list is not exhaustive, but the Court finds no need to expound on every instance of a likely breach.

Next, under Delaware law, to be enforceable, restrictive covenants "must (1) meet general contract law requirements, (2) be reasonable in scope and duration, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." *Id.* (quoting *Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574–NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004)); *Research & Trading Corp. v. Pfuhl*, No. CIV. A. 12527, 1992 WL 345465, at *6 (Del. Ch. Nov. 18, 1992) ("an agreement restricting competition will still be unenforceable, even at law, unless (1) its duration is reasonably limited temporally, (2) its scope is reasonably limited geographically, (3) its purpose is to protect legitimate interests of the employer, and (4) its operation is such as to reasonably protect those interests.")

Here, the restrictive covenants meet these requirements. First, they meet general contract law requirements because Dwyer promised to abide by the non-compete and non-solicitation provisions in exchange for a stock option and a stock award. *See id.* Next, while the Court underscores that it is not making a final determination on this issue, it finds that the covenants are likely reasonable in scope and duration, especially given CPI's position that it only seeks to enforce them to prohibit Dwyer from working in MPS's transaction card business during the pendency of this litigation. (*See* Pls.' PI Mem. at 16.) Moreover, the covenants surely protect the legitimate economic interests of CPI to protect its confidential information, trade secrets, and the goodwill of its clients. *See, e.g.*, *Pfuhl*, 1992 WL 345465, at *12 ("Courts have long recognized that an employer has an interest in the goodwill created by its sales representatives and other employees,

38

which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs.")

In sum, the Court concludes that, for the purposes of this motion, CPI has shown a fair chance of prevailing on the merits of its claim against Dwyer for fraudulent inducement of the amendment and for breach of the restrictive covenants in the Option Agreement and the Unit Agreement.

### d.    Tortious Interference with Contract (Searfoss and Glinert)

On this claim, the Court need not determine whether Minnesota or Delaware law ultimately governs because the law in both states is essentially the same. To succeed on a claim for tortious interference with contract, CPI must show "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *E–Shops Corp. v. U.S. Bank Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012) (internal quotation and citation omitted); *Tristate Courier*, 2004 WL 835886, at *12 (Tortious interference with contract requires plaintiff to show (1) "that there is a contract which the defendant was aware of"; (2) "an intentional act by the defendant that is a significant factor in causing the breach of that contract"; and (3) that such act was committed "without justification" and caused injury.)

In their depositions, Searfoss and Glinert acknowledged that they understood from the beginning of the process of hiring Dwyer that he had certain contractual obligations to CPI, including those of non-disclosure and non-compete. (Glinert Dep. at A16/63–64; Searfoss Dep. at A45/41.) With respect to Searfoss, this Court finds that he actively pursued information and advice from Dwyer related to confidential CPI matters for the benefit of

MPS. For example, on April 12, a month before the Amendment was signed, Dwyer texted to Searfoss: "Here is what my designer came up with for a ████████████ To this, Searfoss responded, "Looks good…I would like to run these ████████ for efficiencies . . . ." (*Id.*, Entry No. 1862.) At his deposition, Searfoss indicated that he understood this exchange to relate to the ████████████ and that Searfoss "was looking to design something more efficient, which was related to the envelope business." (Searfoss Dep. at A56/85–86.) This Court is hard-pressed to find that this does not provide fair grounds for showing that Searfoss tortiously interfered with Dwyer's contractual obligations to CPI.

Similarly, this Court finds that CPI has carried its burden as to Glinert. On April 20, again before the Amendment was signed, Dwyer emailed to Glinert, as well as another individual per Glinert's direction,[14] a list of the accounts that he managed as of April 12, 2017, along with the products generating revenue for those accounts for the preceding 12-month period. (Ex. A to Vats-Fournier Decl. (Ex. 5 (email thread between Dwyer and Glinert)) at A123–24; *see also* Glinert Dep. at A18–19/72–74.) Under the Confidentiality Agreement, the names of customers, as well as the types and amounts of products acquired from CPI, were expressly included in the definition of "confidential information" Dwyer was not to divulge except as required to carry out his duties. (Confidentiality Agreement ¶ 1.) The Court notes that neither Glinert nor Searfoss countered this evidence or advanced

---

[14] It is unclear whether the other individual was an attorney, but Glinert states that this list of customers was being provided to MPS attorneys. (Glinert Dep. at A18–19/72–74.)

arguments for why the Court should not find that CPI has a fair chance of prevailing on this claim; instead, they simply argue that "CPI's claims for tortious interference and civil conspiracy are not germane to this Motion. Once again, CPI focuses exclusively on historical conduct and events." (MPS Defs' Opp'n at 18.)

In sum, after thoroughly reviewing the record before it and the parties' arguments, the Court concludes that CPI has shown a likelihood of success on the merits on several counts, favoring CPI's request for injunctive relief.

### 3.  Irreparable Harm

To receive injunctive relief, the moving party must also show that it faces a sufficient threat of irreparable harm. *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam). Here, the Court again need not decide whether Minnesota or Delaware law controls, because under either, CPI has carried its burden of showing irreparable harm.

Under Delaware law, "contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing preliminary injunctive relief." *Cirrus Holding Co. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001); *see True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 44 (Del. Ch. 1997) ("The irreparable harm element of the injunction standard is established by [defendant's] own contractual stipulation" that its breach "will constitute irreparable harm to [plaintiff], entitling [plaintiff] to injunctive relief."); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*, No. 15744, 1997 WL 458494, at *9 (Del. Ch. Aug. 7, 1997) (holding that a contractual stipulation that breach of the non-compete clause would cause "substantial and

41

irreparable harm" "alone suffices to establish the element of irreparable harm, and [defendant] cannot be heard to contend otherwise.")

Here, the Option Agreement and the Unit Agreement include a stipulation that if Dwyer were to breach the restrictive covenants, CPI would suffer irreparable harm. The Option Agreement provides that "[Dwyer's] services to [CPI] are unique in nature and of an extraordinary value to [CPI], and . . . [CPI] could be irreparably damaged if [Dwyer] were to provide similar services to any person or entity competing with [CPI] or engaged in a similar business." (Option Agreement ¶ 10(b).) Similarly, Dwyer acknowledged in the Unit Agreement that he "has been entrusted with access to trade secrets and confidential information that, if made available to non-[CPI] employees, would cause irreparable harm to [CPI] . . . ." (Unit Agreement ¶ 6(a)(iv).) In this same agreement, Dwyer stipulated that "[i]n the event of [his] actual or threatened breach," "[CPI] will be entitled to provisional and injunctive relief in addition to any other available remedies at law or equity." (*Id.* ¶ 6(d)(iii).) Under Delaware law, these stipulations suffice for a finding of irreparable harm.

But even without these stipulations, CPI has demonstrated that Dwyer's breach of the restrictive covenants has caused and will continue to cause irreparable harm. The record reflects that Dwyer engaged in chronic violations of the confidentiality and non-compete obligations he had to CPI. Although Dwyer and MPS repeatedly stress that MPS never pursued some of these leads, there is conflicting evidence in the record. And it is difficult, if not impossible, to quantify the monetary harm that sharing this kind of information caused or will cause CPI. In her second declaration, O'Leary further

describes how Defendants' conduct is likely causing irreparable harm to CPI. (*See* Second Decl. of Margaret O'Leary ("Second O'Leary Decl.") [Doc. No. 185].) For example, she describes a CPI customer telling her that "MPS had informed [the customer] that if [the customer] went with MPS, [it] could expect pricing to be lower within a specific range than the pricing the customer was receiving from CPI." (*Id.* ¶ 6.) O'Leary contends that "[t]he only way that MPS would know CPI's specific pricing is if it had been provided to them from someone with inside knowledge of CPI's pricing," such as Dwyer. (*Id.*) O'Leary provides additional similar examples that support a finding of irreparable harm. (*See* Second O'Leary Decl.)

Minnesota law is in accord with a finding of irreparable harm in this case. In Minnesota, "[i]rreparable injury can be inferred from the breach of a restrictive covenant if the former employee came into contact with the employer's customers in a way which obtains a personal hold on the good will of the business." *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 452 (Minn. Ct. App. 2001) (alteration in original) (citations omitted). For example, in *Webb Publishing Co. v. Fosshage*, the Minnesota Court of Appeals inferred irreparable harm where the defendant "worked closely" with the plaintiff's clients and considered them friends, and at least one client considered defendant part of "a winning team." 426 N.W.2d 445, 448–49 (Minn. Ct. App. 1988). Similarly, in *St. Jude Medical. S.C., Inc. v. Ord*, the court inferred irreparable harm where the employee who marketed and sold the plaintiff's products had violated a non-compete covenant, finding that the defendant was "the beneficiary of the good will of [plaintiff's] customers and that [plaintiff] faces irreparable harm from continued non-compete

43

violations by [defendant]." No. 09-cv-738 (JNE/JSM), 2009 WL 973275, at *5 (D. Minn. Apr. 10, 2009). In contrast, courts have not inferred irreparable harm where defendant had "virtually no interaction" with the plaintiff's customers and had no personal influence over them. *See AdvancePCS v. Moen*, No. 01-cv-2099 (JRT/FLN), 2001 WL 1690043, at *3 (D. Minn. Dec. 7, 2001).

Here, there is ample evidence to suggest that Dwyer had a personal hold on the good will of CPI's business such that irreparable harm can be inferred. For instance, Dwyer himself indicated that his responsibilities at CPI included managing client relationships, prospecting new clients and customers, as well as heavy involvement in production and servicing of accounts. Dwyer would call on these clients and meet with them personally. Other evidence suggests that Dwyer even considered some of these customers his friends. Moreover, Glinert testified that MPS hired Dwyer because he was considered a "good salesperson and team player." (Glinert Dep. at A13/49.) These words would ring hollow unless, through his position at CPI, Dwyer had established a track record of forming meaningful relationships with the customers he serviced. [15]

In sum, the Court finds that this factor also weighs strongly in favor of granting injunctive relief.

---

[15] Moreover, the Court finds unpersuasive Defendants' efforts to cast CPI's motion as being preoccupied with historical events. As already described, these events allow the Court to infer irreparable harm, even if it had not otherwise found evidence of actual past and future irreparable harm. For similar reasons, the Court need not address CPI's alternative argument that it should draw a negative inference against MPS based on the parties' discovery disputes. (Pls.' Reply at 6–10.) The Court expresses no opinion on this issue.

### 4. Balance of Harms

When considering the balance of harms, courts must weigh "the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction." *Cenveo Corp. v. S. Graphic Sys., Inc.*, No. 08–5521 (JRT/AJB), 2009 WL 161210, at *4 (D. Minn. Jan. 22, 2009) (quotations omitted). The goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued. *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994).

As the Court already described, CPI would be irreparably harmed absent an injunction. The same, however, is not true for Dwyer or MPS. CPI stated its amenability to enforcing the restrictive covenants in the Original Agreements only to the extent they prevent Dwyer from working in MPS's transaction card business. (Pls.' PI Mem. at 16.) Thus, Dwyer will not be restricted from working for MPS generally or earning a living. In fact, MPS and Dwyer contend that Dwyer's primary responsibilities do not primarily relate to transaction cards, and that they are "substantially different" from those he had at CPI, minimizing any harm that they might incur. (*See* Third Dwyer Decl. ¶¶ 14–15.) Accordingly, the balance of the equities also favors the entry of an injunction.

### 5. Public Interest

The public has a strong interest in preserving and fostering business competition. *See Lasermaster Corp. v. Sentinel Imaging, Inc.*, 931 F. Supp. 628, 637 (D. Minn. 1996). This same interest does not extend to unfair competition. *See Millard v. Elec. Cable Specialists*, 790 F. Supp. 857, 863 (D. Minn. 1992). Public interest favors "the enforcement of valid

business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition." *Bos. Sci. Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1042 (D. Minn. 2010) (quotations omitted). However, courts also recognize that "[a] person's right to labor in any occupation in which he is fit to engage is a valuable right, [and] should not be taken from him, or limited, by injunction, except in a clear case showing the justice and necessity therefor." *Ultra Lube, Inc. v. Dave Peterson Monticello Ford-Mercury, Inc.*, No. C8-02-658,  2002 WL 31302981, at *6 (Minn. Ct. App. Oct. 15, 2002) (citing *Standard Oil Co. v. Bertelsen*, 243 N.W. 701, 703 (Minn. 1932)).

Here, the Court again concludes that given the extent of Dwyer's and the MPS Defendants' wrongful conduct, protecting CPI's confidential information and legitimate business interests outweighs the temporary restrictions on Dwyer's employment options and MPS's related business activities. As such, CPI's Motion for a Preliminary Injunction is granted as detailed in Section III of this Order.

### B.  Motion for Partial Dismissal

#### 1.  Standard of Review

On a motion to dismiss under Rule 12(b)(6), the Court accepts as true the factual allegations in the complaint and construes all reasonable inferences arising therefrom most favorably to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (citing *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999)). The Court, however, need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that plaintiffs draw from the facts pled. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). In addition,

the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003), and may also consider public records, *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

In addition to the standards set forth above, Rule 9(b) mandates a heightened pleading standard with respect to fraud-based claims. *See Drobnak v. Andersen Corp.*, 561 F.3d 778, 783–84 (8th Cir. 2009) (applying Federal Rule of Civil Procedure 9(b)'s heightened pleading standard to fraud-based claims brought under state law). In order to satisfy Rule 9(b)'s particularity requirement, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Thayer v. Planned Parenthood of the*

*Heartland*, 765 F.3d 914, 916–17 (8th Cir. 2014) (citation and internal quotation marks omitted). "In other words, the complaint must identify the who, what, where, when, and how of the alleged fraud." *Id.* at 917 (citation and internal quotation marks omitted). However, "Rule 9(b) does not require that the exact particulars of every instance of fraud be alleged, so long as the complaint includes enough detail to inform the defendant of the core factual basis of the fraud claims." *Ransom v. VFS, Inc.*, 918 F. Supp. 2d 888, 898 (D. Minn. 2013) (citation and internal quotation marks omitted). In determining whether allegations of fraud are sufficiently pled, the Court should consider the complaint as a whole. *See Evangelical Lutheran Church in Am. Bd. of Pensions v. Spherion Pac. Workforce LLC*, No. 04-4791 (ADM/AJB), 2005 WL 1041487, at *3 (D. Minn. May 4, 2005) (finding that a claim of negligent misrepresentation survived where the complaint, "analyzed as a whole, adequately put[] [the defendant] on notice of the particular instances of misrepresentation claimed by [the plaintiff]").

### 2. Fraudulent Inducement Claim Against MPS and Searfoss (Count III)

MPS argues that CPI's claim against MPS and Searfoss for fraudulent inducement of the Amendment (Count III) must be dismissed because CPI failed to meet the particularity requirements of Rule 9(b). (*See* MPS and Searfoss Dismissal Mem.) Specifically, MPS alleges that CPI does not identify any alleged misrepresentations made by MPS or Searfoss, and absent any alleged misrepresentation, MPS's claim does not state a claim for fraudulent inducement. (*Id.* at 7–8.)

CPI disagrees. It contends that Minnesota does not require proof of a direct misrepresentation to impose liability for common law fraud, and that in any event, it has

properly alleged that MPS and Searfoss took part in the fraudulent inducement through a conspiracy. (Pls.' Mem. Opp'n Partial Dismissal ("Pls.' Opp'n Dismissal") [Doc. No. 165] at 3–4.)

This Court agrees with MPS and Searfoss and finds that Count III of the Amended Complaint does not meet the particularity requirement of Rule 9(b) as to them. CPI's complaint is devoid of any "who, what, where, when, and how" of MPS and Searfoss's alleged fraudulent inducement. The potentially relevant parts of the complaint state:

> 65. Dwyer's misappropriation of CPI's trade secrets and other confidential business information was part of a persistent, well-orchestrated campaign of unfair competition by MPS, Searfoss, and Glinert. MPS, Searfoss, and Glinert, through their systematic, concerted, and unlawful efforts, are attempting to move business from CPI to MPS.

> 66. In furtherance of MPS' scheme, Dwyer conspired with MPS, Searfoss, and Glinert to misappropriate CPI confidential information and to target CPI clients in furtherance of MPS' corporate interests while still employed by CPI.

> 67. Dwyer's collusion with MPS, Searfoss, and Glinert started well before the termination of his employment with CPI on June 16, 2017. For example, Dwyer sent a copy of the Confidentiality and Nonsolicitation Agreement to Searfoss on January 4, 2017, from his personal email account (mr.j.dwyer@gmail.com).

(Am. Compl. ¶¶ 65–67.) And none of the paragraphs under Count III in the Amended Complaint contain a single factual assertion that would support the fraudulent inducement claim against MPS and Searfoss. (*See* Am. Compl. ¶¶ 117–22.) Moreover, the Court rejects CPI's contention that its allegation of a civil conspiracy (Count X) saves its fraud claim under Rule 9(b). The allegations under Count X likewise do not contain any factual allegations that comply with the particularity requirements of that Rule.

Therefore, these Defendants' Motion for Partial Dismissal as to Count III is granted. However, in view of the liberal pleading standards of the Federal Rules of Civil Procedure, and because the date for amending pleadings has not been set, let alone passed, the Court grants the motion without prejudice and allows CPI, per their request, leave to amend the Amended Complaint to attempt to add sufficient facts to support its fraud claim.[16]

### 3. Unfair Competition Claim Against MPS (Count IX)

Next, MPS argues that CPI's claim for unfair competition must be dismissed, asserting that in Minnesota, a claim for unfair competition is not an independent cause of action. (MPS and Searfoss Dismissal Mem. at 8.) Rather, MPS asserts that this claim is entirely "parasitic" and requires identifying an underlying tort that is not duplicative of other counts in the complaint. (*Id.* n. 4 (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632 (Minn. 1982).) MPS argues that CPI has failed to meet this requirement. (*Id.* at 8–9.)

CPI again disagrees. It contends that while "an unfair competition claim cannot be *wholly* duplicative of another claim," it is permitted when non-duplicative tortious behavior is alleged. (Pls.' Opp'n Dismissal at 5.) CPI contends that it has alleged two non-duplicative grounds to support its unfair competition claim: (1) that MPS improperly obtained and used confidential information; and (2) that MPS intentionally interfered with current and prospective business relationships of CPI. (*Id.*)

---

[16] CPI asserts that it now has information to add Glinert as a defendant on that count, and it will be permitted to do so as well.

The Court agrees with CPI, and finds that its claim that MPS engaged in unfair competition does not warrant dismissal at this stage. At the outset, MPS and Searfoss's contention that unfair competition is not an independent cause of action in Minnesota is not quite on point. *See Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*, 931 F. Supp. 638, 643 (D. Minn. 1996) ("Minnesota recognizes unfair competition as an independent cause of action."). However, because "[u]nfair competition is a general category of torts recognized . . . to protect commercial interests," it is true that it does not have specific, standalone elements applicable to every case. *Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd.*, 552 N.W.2d 254, 268 (Minn. App. 1996) (citation omitted). This is why, "[i]n order to pursue a claim for unfair competition, a plaintiff must identify the underlying tort that is the basis for the claim." *Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1142 (D. Minn. 2011) (citation omitted). The underlying torts that may support an unfair competition claim include, but are not limited to, tortious interference with prospective economic advantage or misappropriation of trade secrets. *Dexon Comput., Inc. v. Modern Enter. Sols., Inc.*, No. A16-0010, 2016 WL 4069225, at *7 n.1 (Minn. Ct. App. Aug. 1, 2016). That a plaintiff must identify the underlying tort, however, is quite different from the contention that unfair competition is not an independent cause of action in Minnesota. As MPS correctly contends, however, where a plaintiff bases its claim of unfair competition on the same tort independently alleged in the complaint, the unfair competition claim may be *duplicative* of the tort claim and may be dismissed. *See Cenveo*, 784 F. Supp. 2d at 1142.

Here, the Court is persuaded that, at this stage in litigation, CPI has sufficiently identified at least two underlying torts that may support its claim of unfair competition

which do not wholly duplicate other counts in the complaint. First, CPI alleges that MPS obtained and used confidential information to unfairly compete with CPI. (Am. Comp. ¶ 174.) As thoroughly discussed above, disclosure, misuse, or acquisition of confidential information is not necessarily actionable as misappropriation of *trade secrets*. Otherwise stated, confidential information is broader than trade secret information, and thus a claim of unfair competition based on misuse of confidential information is not wholly subsumed by a trade secrets misappropriation claim. *See Radisson Hotels*, 931 F. Supp. at 644 (refusing to dismiss the unfair competition claim under Rule 12(b)(6) where plaintiff's unfair competition claim was not necessarily based on exactly the same conduct as the trade secret and breach of contract claims alleged as separate counts in the complaint); *accord ACIST Med. Sys., Inc. v. OPSENS, Inc.*, No. 11-cv-539 (ADM/JJK), 2011 WL 4640884, at * 5 (D. Minn. Oct. 4, 2011) (ultimately dismissing unfair competition claim as duplicative but first noting that "the unfair competition claim is distinguishable from the misappropriation of trade secrets claim in that it covers disclosure of confidential information").

Moreover, CPI has also alleged that MPS tortiously "interfere[d] with CPI's current and prospective relationships with its customers," and does not allege this tort as a standalone count in its complaint.[17] To prevail on a claim for tortious interference with

---

[17] CPI does allege tortious interference with contract against the MPS Defendants. (Am. Compl. ¶¶ 161–66 (Count VIII).) However, Minnesota recognizes both tortious interference of contract as well as "tortious interference with prospective economic advantage." *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 217 (Minn. 2014); *Witte Transp. Co. v. Murphy Motor Freight Lines, Inc.*, 193

prospective economic advantage,[18] a plaintiff must prove: "1) [t]he existence of a reasonable expectation of economic advantage; 2) [d]efendant's knowledge of that expectation of economic advantage; 3) [t]hat defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; 4) [t]hat in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and 5) [t]hat plaintiff sustained damages." *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). The Court is not persuaded at this stage in litigation that CPI's claim of unfair competition based on this underlying tort is wholly duplicative of other claims in the complaint. Accordingly, MPS's Motion for Partial Dismissal is denied as to Count IX (Unfair Competition).

## III.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1.    Plaintiffs' Motion for a Preliminary Injunction is **GRANTED** as follows:

---

N.W.2d 148, 151 (Minn. 1971) (noting that a claim can be brought "for the wrongful interference with noncontractual as well as contractual business relationships").

[18] Although CPI alleges that MPS "interfered with CPI's current and prospective business relationships with its customers," the Minnesota Supreme Court recently explained that "the phrase 'tortious interference with prospective economic advantage' most accurately describes the cause of action," and this Court encourages the parties to follow this convention. *See* 844 N.W.2d at 217.

a.  Defendants Dwyer, Searfoss, Glinert, and MPS whether alone, through a corporate entity, or in concert with others, including any officer, agent, employee, and/or representative of MPS, are restrained from directly or indirectly:

    i.  Communicating, disclosing, divulging, or furnishing any of CPI's confidential and proprietary information or trade secrets to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever; or

    ii.  Using any of CPI's confidential and proprietary information or trade secrets;

b.  Defendant Dwyer, additionally, whether alone, through a corporate entity, or in concert with others, including any officer, agent, employee, and/or representative of MPS, is restrained from directly or indirectly working in or being exposed to, any aspect of MPS's transaction card business. Moreover:

    i.  MPS and Dwyer are instructed to work with their counsel to create a plan to ensure that Dwyer is walled off from information relating to MPS's transaction card business, similar to the ethical walls that attorneys use in private practice.

    ii.  That plan shall be submitted to this Court within fourteen (14) days of the date of this Order, and CPI shall have an opportunity to review and lodge any objections to the plan.

    iii.  The plan shall include an enumeration of the steps that MPS proposes to take to wall off Dwyer as described herein; the communication plan to inform MPS employees and others who need to know of this wall; and the measures with respect to IT to ensure that Dwyer is not exposed to information about MPS's transaction business in electronic communications.

c.  Defendants Dwyer, Searfoss, Glinert, and MPS shall return all documents containing CPI's confidential, proprietary, or trade secret information in their possession and control no later than seven (7) business days following the date of entry of this Order.

d.  Defendants Dwyer, Searfoss, Glinert, and MPS shall execute declarations under oath that they no longer possess any documents containing CPI's confidential, proprietary, or trade secret information.

2.  MPS and Searfoss's Motion for Partial Dismissal pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) [Doc. No. 48] is **GRANTED in part and DENIED in part** as follows:

    a.  Plaintiffs' Count III (Fraudulent Inducement of the Amendment) is **DISMISSED as to Defendants MPS and Searfoss WITHOUT PREJUDICE**; and

    b.  MPS and Searfoss's Motion for Partial Dismissal is **DENIED** as to Count XI (Unfair Competition).

3.  This Order is filed under seal. **Within fourteen (14) days of the date of this Order, the parties are ORDERED** to show cause as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long. The parties will file briefs, under seal, each no longer than seven (7) pages, on this subject. Each party will also file, again under seal, a copy of this Order showing its proposed redactions. If the parties agree on these issues, they may file under seal a joint brief and/or proposed redacted order.


Dated: December 29, 2017                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge