## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CPI Card Group, Inc., and<br>CPI Card Group-Minnesota, Inc.<br><br>                          Plaintiffs,<br><br>    v.<br><br>John Dwyer,<br>Multipackaging Solutions, Inc.,<br>John Searfoss, and<br>Ken Glinert<br><br>                  Defendants. | Court File No.  17-cv-03983-SRN-FLN<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiffs CPI Card Group Inc. and CPI Card Group-Minnesota, Inc. (collectively, "CPI"), for its Second Amended Complaint against Defendants John Dwyer, Multipackaging Solutions, Inc., John Searfoss, and Ken Glinert, allege as follows:

## INTRODUCTION

1.     This action arises from the deliberate and extensive misappropriation of a significant amount of CPI's trade secrets and other confidential business information by its former Senior Account Executive, John Dwyer, and disclosure of that confidential business information to Dwyer's current employer, Multipackaging Solutions, Inc. ("MPS," a direct competitor of CPI) and its employees John Searfoss and Ken Glinert, in violation of federal, state and common law.  This action also arises from Dwyer's breach of his Confidentiality and Nonsolicitation Agreement, Stock Option Award Agreement, Restricted Stock Unit Agreement, Amendment to Option Award Agreement and Confidentiality and Nonsolicitation Agreement (the "Amendment"), Dwyer's breach of

his duties of loyalty and confidentiality to CPI, and MPS, Searfoss and Glinert's conspiracy aiding and abetting Dwyer in violating his statutory, contractual and common law duties to CPI for the express purpose of competing unfairly against CPI.

2.      The Court ordered and the parties conducted limited discovery pursuant to a preliminary injunction motion.  Defendants MPS and Searfoss moved the Court to dismiss Count III (Fraudulent Inducement of the Amendment), and Count XI of CPI's Amended Complaint (Unfair Competition).  The Court granted Plaintiff CPI's motion for preliminary injunction; dismissed without prejudice and with ability to re-plead Count III (Fraudulent Inducement) as to MPS and Searfoss; and denied  Defendants' motion to dismiss Count XI (Unfair Competition).  [Memorandum Opinion and Order Filed Under Seal, ECF Doc. No. 55.]   The preliminary injunction is currently in effect.

3.      Absent the relief requested in this Second Amended Complaint, CPI will continue to be damaged by Defendants' conduct.

## THE PARTIES

4.      CPI Card Group, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 10026 West San Juan Way, Suite 200, Littleton, CO 80127.  CPI Card Group-Minnesota, Inc. is a corporation organized and existing under the laws of Minnesota with its principal place of business at 2430 Prior Avenue N, St. Paul, MN 55113.  CPI is a leading provider of payment cards and related services, including packaging products for various retail industries.  CPI's products include secure packaging for activatable point-of-sale cards.

5.      Until June 16, 2017, Dwyer was a CPI employee residing in Minnesota.

6.      On information and belief, MPS is a Delaware corporation with its headquarters located at 150 East 52nd Street, 28th Floor, New York, New York 10022. MPS may be served with process via its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  MPS is a provider of secured card packaging, and is a direct competitor of CPI.

7.      John Searfoss is a Senior Vice President of Sales at MPS, and resides near Dallas, Texas.

8.      Ken Glinert is a Senior Vice President of Sales at MPS residing in New York.

### JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Dwyer because he is a resident of Minnesota, and he committed the acts complained of in this Complaint, in whole or in part, in the State of Minnesota.

10.     This Court has personal jurisdiction over MPS because MPS has substantial and continuous business contacts in the State of Minnesota.  MPS has established minimum contacts within the forum such that the exercise of jurisdiction over MPS would not offend traditional notions of fair play and substantial justice.

11.     This Court has personal jurisdiction over John Searfoss and Ken Glinert because the claims stated against John Searfoss and Ken Glinert arise from and are directly related to their contacts with and activities in the State of Minnesota. Specifically, John Searfoss and Ken Glinert knowingly communicated with Dwyer in the

State of Minnesota for the express purpose of wrongfully obtaining information about CPI confidential business information and technology, business opportunities with current and prospective CPI clients for which work was performed in Minnesota, and some of which are, on information and belief, headquartered in the State of Minnesota.

12. This Court has original jurisdiction over misappropriation of trade secret claims under 18 U.S.C. § 1836 (c). This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367.

13. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because Dwyer resides in this judicial district, because MPS, Searfoss, and Glinert transact business in the State of Minnesota, and because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTS

14. CPI is a leader in the market for credit, debit and prepaid card printing, manufacturing, and packaging ("transaction cards"). Among the secure payment solutions CPI provides to its customers are EMV cards (a/k/a "chip" cards), open loop, gift, and general purpose reloadable prepaid cards, closed loop prepaid cards, transit cards, instant issuance cards and solutions, mobile payment solutions, on-demand personalization and fulfillment solutions for customers, digital card issuance solutions and e-services to help with card fulfillment and management. CPI also provides card design and customization services, and it manufactures secure packages for all of its prepaid related cards.

## CPI'S MEASURES TO PROTECT ITS
## CONFIDENTIAL BUSINESS INFORMATION

15.     CPI's ability to preserve the confidentiality of its confidential business information is critical to its success.  Access to CPI's confidential business information would give any of its competitors who acquired such information an unfair competitive advantage.  At a minimum, a competitor would be able to use CPI's confidential business information to compete unfairly by undercutting CPI's pricing, marketing and service offerings to current and prospective customers.

16.     Accordingly, CPI has implemented comprehensive measures to protect and maintain the confidentiality of its sensitive and proprietary business information, including but not limited to written policies identifying CPI confidential information, prohibiting employee disclosure, restricting access to CPI's physical facilities and databases, and establishing safeguards against electronic access to or use of CPI information.

## THE DWYER CONFIDENTIALITY AND
## NONSOLICITATION AGREEMENT

17.     In addition to the measures discussed above, Dwyer entered into employment contracts with CPI, which obligated him to preserve and not disclose or use CPI confidential information, except as authorized for the benefit of CPI.

18.     On March 3, 2010, Dwyer executed the Confidentiality and Nonsolicitation Agreement (Exhibit A) as a condition of employment with CPI.

19.     Thereafter, Dwyer began his employment with CPI.

20.    At least in the final five years Dwyer was with CPI, he held the position of Senior Account Executive.

21.    In his capacity as a Senior Account Executive, Dwyer was responsible for sourcing and managing CPI's client relationships throughout the country, and he was provided privileged access to CPI's confidential information in order to perform his job.

22.    Under the Confidentiality and Nonsolicitation Agreement, Dwyer agreed not to disclose or misuse CPI's confidential business information.   The Confidentiality and Nonsolicitation Agreement provides, in relevant part:

> **I will not disclose, duplicate or record or in any other manner reproduce in whole or in part any Confidential Information that I learn or acquire during my employment except as ordinarily necessary for me to perform my assigned duties on behalf of CPI Card Group or unless CPI Card Group expressly directs me to do so.** I will not remove Confidential Information from the location of my employment except as expressly permitted or directed by my supervisor.

Confidentiality and Nonsolicitation Agreement ¶ 2(a) (emphasis added).

23.    The Confidentiality and Nonsolicitation Agreement defines "Confidential Information as:

> any information not generally known in CPI Card Group's business as readily ascertainable by proper means by others, including CPI Group competitors or the general public, and includes trade secrets.  It includes, but is not limited to, the names of CPI Card Group and its Affiliates customers and suppliers and the nature of CPI Card Group's relationships with them, for example, types and amounts of products acquired from or supplied to CPI Card Group.  It includes information about CPI Card Group techniques, estimate standards, inventions and printing processes.   It includes information about CPI Card Group processes and products, including information relating to its research, development, manufacturing, engineering, marketing, and selling.  It also includes, but is not limited to, information about sales, data processing, compensation, pricing and finances.  Confidential information includes the same or similarly defined

information concerning or possessed by Affiliates of CPI Card Group. Affiliates shall mean any and all direct and indirect parent and subsidiaries of CPI Card Group-Minnesota, Inc. I acknowledge that I was formerly employed by Premier Card Solutions and that CPI Card Group purchased certain assets of Premier Card Solutions, including, among other thing, its customer lists and good will. I acknowledge and agree that as used in this Agreement, confidential information shall include the same or similarly defined information that I learned or was exposed to while an employee of Premier Card Solutions.

Confidentiality and Nonsolicitation Agreement ¶ 1.

24.     Dwyer further agreed that:

Disclosure of any of CPI Card Group Confidential Information other than for the sole benefit of CPI Card Group would have a materially detrimental effect upon CPI Card Group, the monetary loss from which would be difficult, if not impossible, to measure.

Confidentiality and Nonsolicitation Agreement ¶ 2(d).

25.     Under the Confidentiality and Nonsolicitation Agreement, Dwyer further agreed not to solicit CPI's customers. The Confidentiality and Nonsolicitation Agreement provides, in relevant part:

Nonsolicitation of Customers.   I will not, during the term of my employment and for a period of one (1) year following the termination of my employment with CPI Card Group for whatever reason, directly or indirectly solicit, on my own behalf or on behalf of another, (a) any of CPI Card Group's then-current customers, or (b) any of CPI Card Group's potential customers for whom I had contact or provided services, either directly or indirectly.

Confidentiality and Nonsolicitation Agreement ¶ 7.

26.     The Confidentiality and Nonsolicitation Agreement provides that it shall be "construed and interpreted according to the laws of the State of Minnesota." Confidentiality and Nonsolicitation Agreement ¶ 13.

27.     Dwyer's execution of the Confidentiality and Nonsolicitation Agreement was knowing and informed.

28.     Dwyer disclosed CPI confidential information and solicited the business of CPI's current and prospective customers during the restricted time period.

## THE DWYER STOCK OPTION AWARD AGREEMENT

29.     Additionally, Dwyer entered into a stock option contract with CPI, in exchange for the option to purchase an aggregate of 2,000 shares of CPI.  This contract obligated him to preserve and not disclose or use CPI confidential information, except to the extent that disclosure was required by Dwyer's performance of duties assigned to him by CPI.  The contract also obligated Dwyer not to work for a competitor of CPI or solicit CPI's customers for one year after his employment with CPI ended.

30.     The Stock Option Award Agreement (Exhibit B) became effective on December 7, 2011.

31.     During the execution of the Stock Option Award Agreement and thereafter, Dwyer continued his employment with CPI as a Senior Account Executive.

32.     Under the Stock Option Award Agreement, Dwyer agreed not to disclose or misuse CPI's confidential business information.  The Stock Option Award Agreement provides, in relevant part:

> **The Participant [Dwyer] not disclose or use at any time, either during the Participant's Service or thereafter, any Confidential Information** (as defined below) of which the Participant is or becomes aware, whether or not such information is developed by the Participant, except to the extent that such disclosure or use is directly related to an required by the Participant's performance of duties assigned to the Participant by any of the

> Company Parties. **The Participant shall take all appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.**

Stock Option Award Agreement ¶ 10(a) (emphasis added)

33.    The Stock Option Award Agreement defines "Confidential Information to include:

> all information, in whatever form recorded or transmitted, related to or coming from within the past, present, or future business affairs of the Company Parties, or other parties whose information any of the Company Parties has in its possession under obligations of confidentiality, including, without limitation, all business plans, lists or information on prospects, customers and prospective customers, data, designs, developments, discoveries, expressions (in any medium), ideas, improvements, innovations, inventions, marketing materials, methods, operations, processes, product development processes, programs, research, systems, techniques, financial information, employee compensation and benefits, personnel records and information, promotional materials and methods, trademarks, or trade secrets, having commercial or proprietary value, and of a secret or confidential nature or otherwise not readily available to members of the general public.

Stock Option Award Agreement ¶ 10(a).

34.    Under the Stock Option Award Agreement, Dwyer further agreed not to work in a similar capacity for a competitor for two years after leaving CPI.  The Stock Option Award Agreement provides, in relevant part:

> The Participant acknowledges and agrees that (i) in the course of the Participant's Service the Participant shall become familiar with the trade secrets of the Company Parties and with other Confidential Information concerning the Company Parties, (ii) the Participant's services to the Company Parties are unique in nature and of an extraordinary value to the Company Parties, and (iii) the Company Parties could be irreparably damaged if the Participant were to provide similar services to any person or entity competing with any of the Company Parties or engaged in a similar business.  In connection with the issuance to the Participant of the Option hereunder, and in consideration for and as an inducement to the Company to enter into this Agreement, the Participant covenants and agrees that

during the period beginning on the Grant Date and ending on the second anniversary of the date of the termination of the Participant's Service (the "Restricted Period"), the Participant shall not, directly or indirectly, either for himself or for or through any other Person, participate in any business or enterprise in a "Competitive Business."

Stock Option Award Agreement ¶ 10(b).

35.     The Stock Option Award Agreement defines "Competitive Business" as including:

> any company, person or entity that is involved in, seeks to become involved in or competes with the Business in the Restricted Territory.   The Participant agrees that this covenant is reasonable with respect to its duration, geographical area and scope.  For purposes of this Agreement, the term "participate in" includes having any direct or indirect interest in any Person, whether as a sole proprietor, owner, shareholder, partner, joint venture, creditor or otherwise, or rendering any direct or indirect service or assistance to any Person (whether as a director, officer, manager, supervisor, employee, agent, consultant or otherwise), other than owning up to 2% of the outstanding stock of any class that is publicly traded.  As used herein, the term "Business" means manufacturing, personalizing, designing, packaging, distributing, selling and marketing plastic cards, including, without limitation, credit cards, debit cards, ATM cards, loyalty cards, gift cards, membership cards, gaming cards, player tracking cards, casino cards, hotel key cards, access cards, ID cards, contactless cards, prepaid gift cards and blank cards, and the term "Restricted Territory" means (a) the United States, Canada, Mexico and the United Kingdom and (b) the geographic area, whether within or outside of the geographic area described in (a) above, where customers with which the Participant had any contact or for which the Participant had any responsibility (whether indirect, direct or advisory) at the time of the termination of this Agreement and at any time during the two year period prior to such termination, reside.

Stock Option Award Agreement ¶ 10 (b).

36.     Finally, under the Stock Option Award Agreement, Dwyer also agreed not to solicit CPI's customers to leave CPI or interfere with CPI's business relationships for two years after leaving CPI:

During the Restricted Period, the Participant shall not (i) induce or attempt to induce to leave the Service of any of the Company Parties or hire any Employee of any of the Company Parties, or in any way interfere with the relationship between any of the Company Parties and any Employee thereof or (ii) call on, solicit or service any customer, supplier, licensee, licensor or other business relation of any of the Company Parties in order to induce or attempt to induce any such Person to cease doing business with any of the Company Parties, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and any of the Company Parties (including making any negative statements or communications concerning any of the Company Parties or their Employees, directors or advisors).

Stock Option Award Agreement ¶ 10(c).

37.   The Stock Option Award Agreement further provides that:

in the event of a breach or threatened breach of any of the covenants contained in this Section 10, the Participant shall forfeit, upon written notice to such effect from the Company:

(i) any and all Options, whether or not vested and exercisable, granted to him or her under the Plan and this Agreement;

(ii) the profit the Participant has realized on the exercise of any Options, which is the difference between (A) the Exercise Price of any Options the Participant exercised after terminating Service and within the six month period immediately preceding the Participant's termination of Service and (B) the Fair Market Value of the Shares purchased under such Options (which difference the Participant may be required to repay to the Company); and

(iii) any and all rights to receive any remaining installment payments due to the Participant from his or her Distribution Account pursuant to Section 7.3 of the Plan

Stock Option Award Agreement ¶ 10(e).

38.   The Stock Option Award Agreement provides that it shall be "construed and enforced in accordance with, and governed by, the laws of the State of Delaware."

Stock Option Award Agreement ¶ 19.

39.     Dwyer's execution of the Stock Option Award Agreement was knowing and informed.

40.     Dwyer disclosed CPI confidential information, provided services to MPS, and solicited the business of CPI's current and prospective customers during the restricted time period.

### THE DWYER RESTRICTED STOCK UNIT AGREEMENT

41.     Dwyer also entered into a restricted stock unit contract with CPI, in exchange for eligibility in an employee incentive plan based on CPI shares.  This contract obligated him not to work for a competitor of CPI or solicit customers of CPI during his employment and for one year following.

42.     The Restricted Stock Unit Agreement (Exhibit C) became effective on March 2, 2016.

43.     Under the Restricted Stock Unit Agreement, Dwyer agreed not to engage in any business that competed with CPI within a restricted territory.  Additionally, Dwyer agreed not to solicit CPI's customers or active prospects within a restricted territory.  Dwyer agreed to refrain from engaging in either activity for a period of one year after his employment with CPI ended.  The Restricted Stock Unit Agreement provides, in relevant part:

(i) _Non-Competition and Non-Solicitation._   During the period of the Participant's Service and for one (1) year following the termination thereof, the Participant shall not and shall cause each of his or her Affiliates not to:

(A) enter into or engage in any business that competes with the Business within the Restricted Territory;

(B) solicit customers, active prospects, business or patronage for any business, wherever located, that competes with the Business within the Restricted Territory or sell any products or services for any business, wherever located, that competes with the Business or could then be provided by the Business within the Restricted Territory;

(C) solicit, divert, entice or otherwise take away any employees, customers, former customers, active prospects, business patronage or orders of the Company or any Subsidiary within the Restricted Territory or attempt to do so; or

(D) counsel, promote or assist, financially or otherwise, any person engaged in any business that competes with the Business within the Restricted Territory.

Restricted Stock Unit Agreement ¶ 6(a) (emphasis added).

44. The Restricted Stock Unit Agreement defines "Business" to mean:

manufacturing, personalizing, designing, fulfilling, packaging, distributing, selling and marketing plastic cards, including, without limitation, credit cards, debit cards, ATM cards, loyalty cards, gift cards, membership cards, gaming cards, player tracking cards, casino cards, hotel key cards, access cards, ID cards, contactless cards, prepaid cards, chip cards, EMV cards, dual interface cards, and blank cards.

Restricted Stock Unit Agreement ¶ 6(b)(i).

45. The Restricted Stock Unit Agreement defines "Restricted Territory" to mean:

(A) the United States, Canada, Mexico and the United Kingdom; and (B) the geographic area, whether within or outside of the geographic area described in clause (A), in which reside any customers with which the Participant had any contact or for which the Participant had any responsibility (whether indirect, direct, or advisory) at the time of the Participant's termination of Service or at any time during the two (2) year period prior to such termination.

Restricted Stock Unit Agreement ¶ 6(b)(ii).

46. The Restricted Stock Unit Agreement further provides that:

(i) _Forfeiture of Award._  In the event of the Participant's breach of any of the Restrictive Covenants, the Restricted Stock Units (whether vested or unvested) shall immediately be forfeited.

(ii) _Recovery of Shares._  In the event of the Participant's breach of any of the Restrictive Covenants, the Company shall be entitled to recover any Shares acquired upon the vesting of the Restricted Stock Units and, if the Participant has previously sold any Shares derived from the Restricted Stock Units, the Company shall also have the right to recover from the Participant the economic value thereof.

(iii) _Other Relief._  In the event of the Participant's actual or threatened breach of this Agreement, the Participant agrees that the Company will be entitled to provisional and injunctive relief in addition to any other available remedies at law or equity.

Restricted Stock Unit Agreement ¶ 6(d).

47.     The Restricted Stock Unit Agreement provides that it shall be "construed and enforced in accordance with, and governed by, the laws of the State of Delaware." Restricted Stock Unit Agreement ¶ 15(f).

48.     Dwyer's execution of the Restricted Stock Unit Agreement was knowing and informed.

49.     MPS is located within the Restricted Territory as defined by the Restricted Stock Unit Agreement.

50.     Dwyer provided services for MPS, a direct competitor of CPI, and solicited the business of CPI's current and prospective customers during the restricted time period.

## THE DWYER AMENDMENT

51.     In March 2017, Dwyer abruptly announced his intention to quit.  CPI asked Dwyer to stay on for a period of time to facilitate the transition of his CPI customers to a new senior sales representative.

52.     Dwyer agreed to remain for a transition period, but as a condition for doing so Dwyer insisted on amending the terms of his agreements with CPI.   Accordingly, Dwyer and CPI signed the Amendment  ("Amendment," Exhibit D) on May 12, 2017.

53.     The Amendment between Dwyer and CPI would have become effective on June 17, 2017 if certain "Satisfying Events" had occurred.

54.     The Amendment, if valid, modified the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement.  Amendment, at 1.

55.     The   Amendment   expressly   preserved   and   reaffirmed   Dwyer's confidentiality obligations in the Confidentiality and Nonsolicitation Agreement and the Stock Option Award Agreement.  Amendment at 4.

56.     The   Amendment   expressly   preserved   and   reaffirmed   Dwyer's non-competition obligations under the Stock Option Award Agreement and the Restricted Stock Unit Agreement.  Amendment at 4.

57.     The Amendment replaced the non-solicitation covenants contained in the Confidentiality and Nonsolicitation Agreement, the Stock Option Agreement, and the Restricted Stock Unit Agreement.  Amendment, at 2–3.

58.     Unbeknownst to CPI, during the time Dwyer's Amendment was under negotiation, Dwyer had already negotiated and accepted employment with MPS for a substantially similar position, and he worked secretly with MPS, Searfoss, and Glinert to scope the modifications to the Amendment in to order to achieve MPS' corporate aims to compete unfairly against CPI.

15

59.     Dwyer kept MPS, Searfoss, and Glinert informed of the negotiations with CPI regarding the Amendment throughout the process.

60.     Dwyer, Searfoss, and Glinert took steps to intentionally hide his employment with MPS during the negotiations with CPI regarding the Amendment.

61.     Dwyer concealed from CPI not only his current employment with MPS, discussions with MPS, Searfoss, and Glinert regarding the scope of the modifications to the Amendment Dwyer was negotiating with CPI – all to knowingly induce and mislead CPI into agreeing to the Amendment under false pretenses.

62.     CPI relied on Dwyer's material misrepresentations, which were known to and aided by MPS, Searfoss, and Glinert, when it agreed to sign the Amendment.

63.     On June 7, 2017, Dwyer began formally working at MPS and traveled to its headquarters in New York, New York.

64.     On June 16, 2017, Dwyer voluntarily terminated employment with CPI.

## DWYER, MPS, SEARFOSS, AND GLINERT MISAPPROPRIATE SIGNIFICANT CONFIDENTIAL BUSINESS RECORDS AND CPI TRADE SECRETS

65.     As a Senior Account Executive at CPI, Dwyer made personal contact with current and prospective CPI clients, and thus developed close relationships with these clients and prospects.  Further, in his role, Dwyer negotiated contracts with current and prospective clients, established pricing strategies for CPI, and had knowledge of the prices CPI quoted to its current and prospective clients.

66.     By virtue of his position as a Senior Account Executive, Dwyer was granted privileged access to CPI confidential business information.  His responsibilities

included having access to numerous confidential documents and databases containing CPI trade secrets and other confidential business information.  Such information includes, but is limited to client proposals, client requirements and preferences, client support needs, pricing information for current and prospective CPI clients (*e.g.*, pricing manuals, quoted prices, client price histories), and implementation details of solutions for current and prospective CPI clients (*e.g.*, design specifications for projects specific to clients, the costs to CPI for developing a specific design or solution for a client, *etc.*).  Dwyer was never authorized to remove this confidential business information from CPI or to use or disclose it outside CPI.

67.     Prior to leaving CPI's employment effective June 16, 2017, and in furtherance of his intention to join MPS, Dwyer misappropriated a significant quantity of trade secrets and other confidential business information belonging to CPI and targeted several of CPI's current and prospective clients, not for the purpose of doing his job at CPI, but rather for his own gain and for use in his future employment with MPS.

68.     Dwyer accomplished this misappropriation by forwarding from his CPI email account (jdwyer@cpicardgroup.com) to his personal email account (mr.j.dwyer@gmail.com) a significant quantity of data as early as January-June 2017, including CPI quote submissions containing confidential pricing information, CPI technical documents containing confidential client information, and CPI presentations containing information about CPI's current and prospective clients, CPI's future product offerings and new, proprietary technologies, CPI's strategic plan for cards and packaging, and CPI's fraud mitigation strategies.

69.     Dwyer later forwarded misappropriated materials from his personal email account (mr.j.dwyer@gmail.com) to his new MPS email account, john.dwyer@westrock-mps.com, as well as to other MPS employees, including Glinert and Searfoss.

70.     Searfoss and Glinert made subsequent disclosures or uses of CPI information provided to them by Dwyer.

71.     Dwyer's misappropriation of CPI's trade secrets and other confidential business information was part of a persistent, well-orchestrated campaign of unfair competition by MPS, Searfoss, and Glinert.  MPS, Searfoss, and Glinert, through their systematic, concerted, and unlawful efforts, are attempting to move business from CPI to MPS.

72.     In furtherance of MPS' scheme, Dwyer conspired with MPS, Searfoss, and Glinert to misappropriate CPI confidential information and to target CPI clients in furtherance of MPS' corporate interests while still employed by CPI.

73.     Dwyer's collusion with MPS, Searfoss, and Glinert started well before the termination of his employment with CPI on June 16, 2017.  For example, Dwyer sent a copy of the Confidentiality and Nonsolicitation Agreement to Searfoss on January 4, 2017, from his personal email account (mr.j.dwyer@gmail.com).  Dwyer, Searfoss, and Glinert also regularly communicated by text message and email, beginning around December of 2016.

74.     Since at least that time, Dwyer has been helping MPS target CPI's current and prospective clients.

75.     In January, 2017, while actively engaged in discussions with MPS relating to taking a job with MPS, Dwyer sent, without CPI authorization, to Searfoss a CPI confidential client opportunity relating to CPI's largest client.

76.     Dwyer's efforts were not in vain.  On information and belief, Dwyer met with Searfoss in Dallas on January 20-22, 2017, and received an offer for employment from MPS as early as February 13, 2017.

77.     On information and belief, MPS, Searfoss, and Glinert purposely targeted Dwyer because of his knowledge of, and relationships with, CPI customers, and his possession of confidential information relating to CPI customers, while he was still employed by CPI.

78.     MPS, Searfoss, and Glinert were aware of Dwyer's contracts with CPI, including the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement.

79.     On March 27, 2017, Dwyer signed an employment agreement with MPS, which MPS' CEO, Mark Shore, countersigned the following day.  Dwyer concealed from CPI the offer and acceptance of employment with MPS.

80.     On March 29, 2017, after memorializing his employment agreement with MPS, and only minutes before he tendered his resignation to CPI, Dwyer sent to his personal Gmail account several documents marked as CPI confidential information. Dwyer later forwarded at least some of these same documents from his personal Gmail account to his MPS email account, Searfoss, and Glinert.

81.     While on vacation from CPI, but still receiving a CPI paycheck and still subject to the employment agreements in effect prior to the Amendment, Dwyer sent to Searfoss and Glinert of MPS a PowerPoint presentation entitled "Strategic Plan." This document contained reference to a number of CPI trade secrets and confidential information, including information on several CPI products not yet released to the market.

82.     After Dwyer had accepted a job with MPS, but had actively concealed that fact from CPI, Dwyer negotiated the terms of a contract with a CPI customer and presented unfavorable terms to CPI.  After Dwyer left CPI, CPI negotiated significantly more favorable terms than what Dwyer had presented as possible.  Had CPI accepted the deal that Dwyer presented to CPI, it would have presented a potential opportunity for MPS to gain a greater share of the customer's business, as the customer does not work with a single source supplier.

83.     By May 22, 2017, MPS had assigned Dwyer an MPS email account (john.dwyer@multipkg.com), which he used to communicate on behalf of MPS early as June 6, 2017, 10 days before terminating employment with CPI.  On information and belief, he used this email account to solicit CPI's current and prospective customers.

84.     In fact, MPS and its employees Searfoss and Glinert were in on Dwyer's plan to stay at CPI while also employed by MPS.  Dwyer, Glinert, and Searfoss had multiple and frequent discussions via text message regarding keeping CPI from finding out that Dwyer had been hired by MPS.

85.     Searfoss encouraged Dwyer to amend his confidentiality, competition, and nonsolicitation agreements before CPI found out that Dwyer was working for MPS.

86.     Dwyer never informed CPI that he had been hired by MPS, even while still working for CPI.

87.     Dwyer visited Searfoss and Glinert at MPS headquarters in New York on June 6-7, 2017.   On information and belief, Dwyer made a presentation to MPS management, including Searfoss and Glinert, using and/or disclosing CPI confidential information and trade secrets in order to explain his business plan for growing MPS's competing business.

88.     On information and belief, Dwyer's proposed business plan for MPS included identifying several of CPI's current and prospective customers as prospective customers for MPS.

89.     CPI's trade secrets and other confidential business information have been developed through considerable time, effort, and expense in the operation of CPI's business.  Further, these trade secrets and other confidential business information are not publicly available and/or cannot be readily duplicated without involving considerable time, effort, or expense.

90.     CPI has taken reasonable steps to identify, protect and preserve the confidentiality of its confidential business information as described in Paragraphs 15 and 16 of this Complaint.

91.     Dwyer improperly acquired and used CPI's trade secrets and other confidential business information not to serve CPI's business interests but instead for his own gain and that of his future employer, MPS.

92.     The trade secrets and confidential business information Defendants misappropriated prior to Dwyer's departure from CPI consist of the exact categories of information MPS (or another similarly situated CPI competitor) would need and use to effectively compete for customers against CPI.

93.     Early attempts to resolve this matter failed, and CPI thus had no choice but to defend its trade secrets by initiating this lawsuit and seeking appropriate injunctive and monetary relief.

## COUNT I

**Misappropriation of Trade Secrets in Violation of Defend Trade Secrets Act
(18 U.S.C. § 1836 *et seq*.) (Against Dwyer, MPS, Searfoss, and Glinert)**

94.    CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

95.    The documents and other information misappropriated by Dwyer contained significant and critical confidential and proprietary information relating to CPI's business.  Such confidential and proprietary information is exclusively CPI's property.

96.    The documents and other information stolen by Dwyer constitute "trade secrets," as defined in 18 U.S.C. § 1839(3), related to products and services used in, or intended for use in, interstate or foreign commerce.

97.    CPI's trade secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by competitors (like MPS) who can obtain economic value from the disclosure or use of the information.

98.    CPI has taken reasonable efforts to protect and maintain the confidentiality of its trade secrets.

99.    CPI has not given express or implied consent to Dwyer to disclose or use CPI's trade secrets as set forth herein.

100.    In violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*., Dwyer misappropriated CPI's trade secrets and has refused to return them after termination of his employment.

101.   Dwyer knew or had reason to know that he acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and/or to limit their use (*i.e.*, in the course of his employment by CPI).  Dwyer stood in a position of trust to CPI and had contractual and legal duties to refrain from disclosing or using for his benefit, or that of a third party, CPI's trade secrets.  These duties arise from the Confidentiality and Nonsolicitation Agreement and the Stock Option Award Agreement, and were reinforced by the Amendment.

102.   Dwyer, with the intent to convert trade secrets that are related to a service used in or intended for use in interstate or foreign commerce to the economic benefit of CPI, and intending or knowing that the offense will injure CPI knowingly engaged in the following conduct: (a) stole, or without authorization, removed, or by fraud or deception obtained such information; and (b) without authorization copied, duplicated, downloaded, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information to himself and to MPS, including to Searfoss and Glinert.

103.   MPS, Searfoss, and Glinert are and were at all relevant times aware of at least some of Dwyer's employment agreements with CPI and the restrictive covenants contained therein, including those requiring Dwyer to keep CPI's confidential information strictly confidential and prohibiting Dwyer from using, disclosing, duplicating, recording, or in any other manner reproducing in whole or in part any confidential information.

104.   MPS, Searfoss, and Glinert acquired, and later disclosed and used CPI's trade secrets received from Dwyer, knowing that Dwyer was improperly disclosing the

trade secrets due to his breach of his contractual and common law duties of confidentiality.

105.   Dwyer's, MPS', Searfoss', and Glinert's improper acquisition and unauthorized use or disclosure, actual or threatened, violates the DTSA, 18 U.S.C. § 1836 *et seq.*, and was willful and malicious.

106.   As a direct and proximate result of Dwyer's, MPS', Searfoss', and Glinert's wrongful conduct, CPI has suffered irreparable injury.   Unless Dwyer, MPS, Searfoss, and Glinert are permanently enjoined from misappropriating, threatening to misappropriate, and/or inevitably disclosing CPI's trade secrets, CPI will suffer irreparable harm for which there is no adequate remedy at law.

107.   CPI has obtained preliminary injunctive relief, and is entitled to permanent injunctive relief against further misappropriation of trade secrets.

108.   CPI has suffered damages, and continues to be damaged, as a direct result of these actual and threatened breaches which include, but are not limited to, lost profits and attorneys' fees CPI has incurred and will incur to enforce its rights under the DTSA.

## COUNT II

**Misappropriation of Trade Secrets under the Minnesota Uniform Trade Secrets Act
(MN. Stat. Ann. § 325C *et seq.*) and Minnesota Common Law
(Against Dwyer, MPS, Searfoss, and Glinert)**

109.   CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

110.   The documents and other information stolen by Dwyer contained significant and critical confidential and proprietary information relating to CPI's business.  Such confidential and proprietary information is exclusively CPI's property.

111.   The documents and other information stolen by Dwyer constitutes "trade secrets" as defined in MN. Stat. Ann. § 325C.01(5).

112.   CPI has taken reasonable efforts to protect and maintain the secrecy or confidentiality of its trade secrets, as described above.

113.   CPI has not given express or implied consent to Dwyer to disclose or use CPI's trade secrets.

114.   In violation of the Minnesota Uniform Trade Secrets Act ("MUTSA"), MN. Stat. Ann. § 325C *et seq*., Dwyer misappropriated CPI's trade secrets as set forth above.

115.   Dwyer knew or had reason to know that he acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and/or to limit their use (i.e., in the course of his employment by CPI).  Dwyer stood in a position of trust to CPI and had contractual and legal duties to refrain from disclosing or using for his benefit, or that of a third party, CPI's trade secrets.  These duties arise from the Confidentiality and Nonsolicitation Agreement and Stock Option Award Agreement, and were reinforced by the Amendment.  They also arise at common law from Dwyer's duty of loyalty to CPI.

116.   Dwyer, with the intent to convert trade secrets that are related to a service used in or intended for use in interstate or foreign commerce to the economic benefit of CPI, and intending or knowing that the offense will injure CPI knowingly engaged in the

following conduct: (a) stole, or without authorization, removed, or by fraud or deception obtained such information; and (b) without authorization copied, duplicated, downloaded, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information to himself and to MPS, including to Searfoss and Glinert.

117.   MPS, Searfoss, and Glinert are and were at all relevant times aware of at least some of Dwyer's employment agreements with CPI and the restrictive covenants contained therein, including those requiring Dwyer to keep CPI's confidential information strictly confidential and prohibiting Dwyer from using, disclosing, duplicating, recording, or in any other manner reproducing in whole or in part any confidential information.

118.   On information and belief, MPS, Searfoss, and Glinert purposely targeted Dwyer because of his knowledge of, and relationships with, CPI customers and his possession of confidential information relating to CPI customers, while he was still employed by CPI.

119.   MPS, Searfoss, and Glinert acquired, and later disclosed and used CPI's trade secrets from Dwyer, knowing that Dwyer was improperly disclosing the trade secrets due to his breach of his contractual and common law duties of confidentiality.

120.   Dwyer's, MPS', Searfoss', and Glinert's improper acquisition and unauthorized use or disclosure, actual or threatened, violates the MUTSA, Minn. Stat. Ann. § 325C *et seq*., and was willful and malicious.

121.   As a direct and proximate result of Dwyer's, MPS', Searfoss', and Glinert's wrongful conduct, CPI has suffered irreparable injury.  Unless Dwyer, MPS, Searfoss,

and Glinert are permanently enjoined from misappropriating, threatening to misappropriate, and/or inevitably disclosing CPI's trade secrets, CPI will suffer irreparable harm for which there is no adequate remedy at law.

122.   CPI has obtained preliminary injunctive relief and is entitled to permanent injunctive relief against further misappropriation of trade secrets.

123.   CPI has suffered damages, and continues to be damaged, as a direct result of these actual and threatened breaches which include, but are not limited to, lost profits and attorneys' fees CPI has incurred and will incur to enforce its rights under the MUTSA.

## COUNT III

### Fraudulent Inducement of the Amendment (Against Dwyer)[1]

124.   CPI incorporates paragraphs 1-93 by reference.

125.   During negotiations for the Amendment, Dwyer withheld material information and made material misrepresentations regarding his employment status with CPI, his employment status with MPS, and that he had consulted with MPS and Searfoss about the Amendment.

126.   Dwyer's misrepresentations were intentional with the goal of inducing CPI to agree to the less comprehensive non-solicitation covenants contained in the Amendment, replacing the more restrictive non-solicitation covenants contained in the

---

[1] Consistent with the Court's orders dated December 29, 2017 (ECF No. 213) and April 13, 2018 (ECF No. 290), CPI has inserted in this Count the language from its Amended Complaint (ECF No. 11), but has altered the title of Count III from the Amended Complaint to make clear that it is only presently asserted against Dwyer.

Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restrict Stock Unit Agreement.

127.    CPI justifiably relied on the information Dwyer provided when entering into the Amendment.

128.    Dwyer's material misrepresentations have caused CPI to suffer injury.

129.    The Amendment is thus null, void, and unenforceable.

<u>**COUNT IV**</u>

**Breach of the Non-Disclosure Covenant in the Confidentiality and Nonsolicitation Agreement (Against Dwyer only) (Minnesota Law)**

130.    CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

131.    The Confidentiality and Nonsolicitation Agreement is a valid and enforceable contract.

132.    CPI has fully performed every obligation it owed to Dwyer under the Confidentiality and Nonsolicitation Agreement.

133.    The Confidentiality and Nonsolicitation Agreement requires Dwyer to keep CPI's confidential information strictly confidential and prohibits Dwyer from using, disclosing, duplicating, recording, or in any other manner reproducing in whole or in part any confidential information.

134.    Dwyer breached the Confidentiality and Nonsolicitation Agreement at least by  (a) retaining CPI's Confidential Business Information following his termination, and

(b) using CPI's Confidential Business Information for purposes other than fulfilling work performed by CPI.

135.   Dwyer's breach of the Confidentiality and Nonsolicitation Agreement has caused CPI to suffer injury.

136.   CPI has obtained preliminary injunctive relief and is entitled to permanent injunctive relief.

137.   CPI has suffered damages, and continues to be damaged, as a direct result of these actual and threatened breaches which include, but are not limited to, lost profits and attorneys' fees CPI has incurred and will incur to enforce its rights under the contract.

## COUNT V

**Breach of the Non-Disclosure Covenant in the Stock Option Award Agreement (Against Dwyer only) (Delaware Law)**

138.   CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

139.   The Stock Option Award Agreement is a valid and enforceable contract.

140.   CPI has fully performed every obligation it owed to Dwyer under the Stock Option Award Agreement.

141.   The Stock Option Award Agreement requires Dwyer to keep CPI's confidential information strictly confidential and prohibits Dwyer from using, disclosing, duplicating, recording, or in any other manner reproducing in whole or in part any confidential information.

142.   Dwyer breached the Stock Option Award Agreement at least by (a) retaining CPI's Confidential Business Information following his termination, and (b) using CPI's Confidential Business Information for purposes other than fulfilling work performed by CPI.

143.   If the Amendment were enforceable, Dwyer would also have violated the Amendment, since it expressly preserved and reaffirmed the confidentiality obligations.

144.   Dwyer's breach of the Stock Option Award Agreement has caused CPI to suffer injury.

145.   CPI has obtained preliminary injunctive relief and is entitled to permanent injunctive relief.

146.   CPI has suffered damages, and continues to be damaged, as a direct result of these actual and threatened breaches which include, but are not limited to, lost profits and attorneys' fees CPI has incurred and will incur to enforce its rights under the contract.

## <u>COUNT VI</u>

**Breach of the Non-Competition Covenants in the Stock Option Award Agreement and the Restricted Stock Unit Agreement (Against Dwyer only) (Delaware Law)**

147.   CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

148.   The Stock Option Award Agreement and the Restricted Stock Unit Agreement are valid and enforceable contracts.

149.    The Non-Competition covenants in the Stock Option Award Agreement and the Restricted Stock Unit Agreement were amended by the Amendment.

150.    The Amendment was fraudulently induced and is null and void.

151.    CPI has fully performed every obligation it owed to Dwyer under the Stock Option Award Agreement, the Restricted Stock Unit Agreement, and the Amendment.

152.    The Stock Option Award Agreement and the Restricted Stock Unit Agreement require Dwyer to not directly or indirectly, either himself or as an employee of another, work for a competitive business for at least one year following the end of his employment at CPI.

153.    Dwyer breached the Stock Option Award Agreement and the Restricted Stock Unit Agreement by working for MPS, a direct competitor, before his last day of employment with CPI.

154.    If the Amendment were enforceable, Dwyer would also have violated the Amendment, since it expressly preserved and reaffirmed the non-competition obligations.

155.    Dwyer's breach of the Stock Option Award Agreement and the Restricted Stock Unit Agreement has caused CPI to suffer injury.

156.    CPI has obtained preliminary injunctive relief and is entitled to permanent injunctive relief.

157.    Additionally, Dwyer is liable for damages under the terms of the Stock Option Award Agreement and the Restricted Stock Unit Agreement.

## COUNT VII

**Breach of the Non-Solicitation Covenants in the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement (Against Dwyer only) (Delaware Law)**

158.    CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

159.    The Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement are valid and enforceable contracts.

160.    CPI has fully performed every obligation it owed to Dwyer under the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement.

161.    The Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement were amended by the Amendment, if the Amendment is valid and operative.

162.    The Amendment was fraudulently induced and is null and void.

163.    The Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement require Dwyer to not attempt or induce customers or employees of CPI to leave CPI for a period of at least one year following Dwyer's last date of employment with CPI.

164.    Dwyer breached the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement by soliciting

customers and employees of CPI to work with MPS less than one year following the end of his employment at CPI.

165.    If the Amendment were enforceable, Dwyer would also have violated the terms of the non-solicitation covenant of the Amendment by soliciting customers and employees of CPI to work with MPS less than one year following the end of his employment at CPI.

166.    Dwyer's breach of the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement, and the Amendment has caused CPI to suffer injury.

167.    CPI has obtained preliminary injunctive relief and is entitled to permanent injunctive relief.

168.    Additionally, Dwyer is liable for damages under the terms of the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement.

## <u>COUNT VIII</u>

### **Breach of the Duty of Loyalty (Against Dwyer)**

169.    CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

170.    By reason of his employment and position with CPI as a Senior Account Executive, Dwyer owed CPI an undivided duty of fidelity and loyalty not to compete with CPI while still employed with it.

171.   While still employed by CPI, Dwyer used MPS email accounts (john.dwyer@multipkg.com) to solicit CPI's current and prospective customers, and otherwise disclosed CPI's confidential business information to MPS, Searfoss and Glinert for the purpose of assisting MPS to compete against CPI and divert customers and prospective from CPI to MPS.

172.   Dwyer's acts breached his duty of loyalty and fidelity to CPI as its employee.

173.   CPI suffered, and will continue to suffer, damages and injury as a result of Dwyer's breach of his duty of loyalty.

## COUNT IX

### Breach of the Duty of Confidentiality (Against Dwyer)

174.   CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

175.   By reason of his employment with CPI as a Senior Account Executive, Dwyer owed CPI an duty of confidentiality not to use confidential information obtained from CPI.

176.   While employed by CPI, Dwyer received confidential information from CPI relating to CPI's current and prospective business, customers, and proprietary technology.

177.   Dwyer had notice that the material he received was confidential. Confidential information was defined in the Confidentiality Agreement that Dwyer

signed as a part of his employment, and many of CPI's confidential materials were labeled as "confidential" or "trade secret."

178.   Dwyer revealed confidential information received during his employment with CPI to CPI's competitor MPS.

179.   Dwyer's acts breached his duty of confidentiality to CPI.

180.   CPI suffered, and will continue to suffer, damages and injury as a result of Dwyer's breach of his duty of confidentiality.

## COUNT X

### Tortious Interference with Contract
### (Against MPS, Searfoss, and Glinert)

181.   CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

182.   The Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement are valid and enforceable contracts.

183.   MPS, Searfoss, and Glinert are and were at all relevant times aware of at least some of Dwyer's employment agreements with CPI and the restrictive covenants contained therein.

184.   On information and belief, MPS, Searfoss, and Glinert purposely targeted Dwyer because of his knowledge of, and relationships with, CPI customers, and his possession of confidential information relating to CPI customers, while he was still employed by CPI.

185.    MPS, Searfoss, and Glinert intentionally and unjustifiably induced Dwyer to breach the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement by, among other wrongful acts, knowingly and intentionally placing Dwyer in a position in which he would violate his confidentiality obligations to CPI, and by actively pursuing CPI's confidential information through Dwyer's position of knowledge and trust.

186.    MPS, Searfoss, and Glinert intentionally and unjustifiably induced Dwyer to breach the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement by, among other wrongful acts, knowingly and intentionally placing Dwyer in a position in which he would violate his nonsolicitation obligations to CPI.

187.    MPS, Searfoss, and Glinert intentionally and unjustifiably induced Dwyer to breach the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement by knowingly and intentionally hiring Dwyer to work for MPS, a direct competitor of CPI.

188.    As a result of MPS', Searfoss', and Glinert's tortious interference and inducement, Dwyer has breached and will continue to breach the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement by, among other wrongful acts, using or disclosing CPI's Confidential Business Information learned while in the employ of CPI.

189.    As a result of MPS', Searfoss', and Glinert's tortious interference and inducement, Dwyer has breached and will continue to breach the Confidentiality and

Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement by, among other wrongful acts, using CPI's business relationships Dwyer learned while in the employ of CPI.

190.    As a result of MPS', Searfoss', and Glinert's tortious interference and inducement, Dwyer has breached and will continue to breach the Confidentiality and Nonsolicitation Agreement, the Stock Option Award Agreement, and the Restricted Stock Unit Agreement by, among other wrongful acts, working for MPS, a direct competitor of CPI.

191.    CPI has suffered, and will continue to suffer, damages because of MPS', Searfoss', and Glinert's conduct.

192.    CPI has obtained preliminary injunctive relief and is entitled to permanent injunctive relief.

193.    Additionally, MPS, Searfoss and Glinert are liable for damages.

## COUNT XI

### Unfair Competition (Against MPS only)

194.    CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

195.    For its own benefit, MPS engaged in unfair competition against CPI by improperly obtaining, using, and disclosing CPI's confidential information to unfairly, wrongfully, and unlawfully compete with CPI and to solicit CPI's customers.

196.    By misappropriating CPI's confidential information, MPS has gained an unfair competitive advantage over CPI.

197.    MPS engaged in unfair competition by intentionally interfering with CPI's reasonable expectations of economic advantage by wrongfully and without justification interfering with CPI's current and prospective business relationships.

198.    As a result of MPS's interference, MPS has gained an unfair competitive advantage over CPI.

199.    As a direct and proximate result of MPS' unfair competition, CPI has suffered, and will continue to suffer, damages.

200.    MPS has, or will be, unjustly enriched for which CPI seeks disgorgement of any and all profits earned by MPS through their unfair competition.

201.    CPI has obtained preliminary injunctive relief and is entitled to permanent injunctive relief.

## COUNT XII

### Civil Conspiracy
### (Against Dwyer, MPS, Searfoss, and Glinert)

202.    CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

203.    Dwyer, MPS, Searfoss, and Glinert knowingly and intentionally agreed to conspire to misappropriate CPI's confidential information and competitive advantages.

204.   Dwyer, MPS, Searfoss, and Glinert knowingly and intentionally took steps in furtherance of the conspiracy to misappropriate CPI's confidential information and competitive advantage.

205.   On information and belief, Dwyer, MPS, Searfoss, and Glinert knowingly and intentionally agreed to conspire to interfere with CPI's current and prospective business relationships and divert customers from CPI to MPS.

206.   Dwyer, MPS, Searfoss, and Glinert knowingly and intentionally took steps in furtherance of the conspiracy to interfere with CPI's current and prospective business relationships and divert customers from CPI to MPS.

207.   Dwyer, MPS, Searfoss, and Glinert knowingly and intentionally agreed to conspire to fraudulently induce CPI into amending Dwyer's employment agreements with CPI.

208.   Dwyer, MPS, Searfoss, and Glinert each agreed to and took steps furtherance of fraudulently inducing CPI into amending Dwyer's employment agreements with CPI.

209.   As a result of the conspiracy and acts in furtherance of the conspiracy, CPI has suffered, and will continue to suffer, damages.

## COUNT XIII

### (In the Alternative)
**Breach of the Amendment to Dwyer's Employment Agreements (Against Dwyer)**

210.   CPI incorporates by reference and re-alleges paragraphs 1–93 of this Complaint as if fully set forth herein.

211.   CPI and Dwyer signed an Amendment to Dwyer's employment agreements on or about May 12, 2017.

212.   CPI contends the Amendment is invalid, null and void, because it was obtained by fraud.

213.   CPI further contends that not all SATISFYING EVENTS in the Amendment were satisfied, and therefore, that the Amendment did not come into effect.

214.   The Amendment, if effective, altered certain terms of Dwyer's Confidentiality and Nonsolicitation Agreement and Restricted Stock Agreement, and left other provisions unchanged.

215.   If the Court should find that the Amendment was not fraudulently obtained and came into effect because all SATISFYING EVENTS occurred, then CPI alleges in the alternative that Dwyer breached the terms of the Amendment.

216.   Dwyer's breach of the Amendment has caused damage to CPI.

## **PRAYER FOR RELIEF**

WHEREFORE, CPI respectfully requests the following relief:

A.   The Court enter permanent injunctive relief which keeps in place the provisions of the preliminary injunction and adds any additional provisions as the evidence justifies;

B.   The Court enter a ruling that the Amendment is null, void, and unenforceable;

C.      The Court require Dwyer to reimburse CPI for all of the compensation and monetary benefits he received from CPI during the period of time in which he was in breach contractual duties to CPI;

D.      The court award CPI appropriate damages, including compensatory, punitive, and exemplary damages, in amounts to be proved at trial;

E.      The court award CPI the attorneys' fees and costs incurred in prosecuting this action; and

F.      The court award all such further relief as may be appropriate.

**<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury upon all the issues to the fullest extent permitted under applicable law.

DATED:  April 25, 2018                     BRIGGS AND MORGAN, P.A.

                                           By: _/s/ Karen D. McDaniel_ _____
                                               James J. Long (#190858)
                                               Karen D. McDaniel (#194554)
                                           2200 IDS Center
                                           80 South Eighth Street
                                           Minneapolis, MN  55402-2157
                                           Telephone: (612) 977-8400
                                           Fax: (612) 977-8650
                                           jlong@briggs.com
                                           kmcdaniel@briggs.com

                                           **ATTORNEYS FOR PLAINTIFFS**
                                           **CPI CARD GROUP, INC. AND**
                                           **CPI CARD GROUP-MINNESOTA, INC.**