UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CPI Card Group, Inc., and<br>CPI Card Group-Minnesota, Inc.,<br><br>    Plaintiffs,<br><br>v.<br><br>John Dwyer, Multi Packaging Solutions, Inc., John Searfoss, and Ken Glinert,<br><br>    Defendants. | Court File No. 17-CV-03983 (SRN/BRT) |

## DECLARATION OF KEN GLINERT IN OPPOSITION TO CPI'S MOTION FOR PRELIMINARY INJUNCTION

I, Ken Glinert, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am a Defendant in the above-entitled action. I submit this declaration in opposition to CPI's Motion to Expand Preliminary Injunction (ECF No. 338).

2. The statements contained in this declaration are based on my own personal knowledge. To the best of my ability, they are true and correct.

*Background/Impact of Injunction Request*

3. My resume is attached hereto as **Exhibit 1**.

4. I live in Chappaqua, New York with my wife and two daughters. This fall, my oldest daughter will begin college and my youngest will enter eighth grade. My wife is not employed and I am the sole source of income for my family.

1

5. I am currently employed by Multi Packaging Solutions ("MPS") as a Senior Vice President of Sales. In this role, I am responsible for MPS's transaction card sales within the card group, as well as direct sales accounts I generated as a sales representative. The entire sales team ultimately reports up through me to President Marc Shore.

6. As a business, MPS started out as business that focused on printing, packaging and graphics, and that is what defined the company for years. MPS's transaction card business grew out of these core business activities, in large part, through the acquisitions of other companies.

7. I do not have any assigned job responsibilities for WestRock.

8. I do not owe any contractual obligations to CPI Card Group, Inc., or CPI Card Group-Minnesota, Inc. ("CPI").

9. Based on my knowledge of CPI, MPS is not a larger transaction card company than CPI. While MPS as a whole may be larger than CPI, MPS also has a folding carton business unrelated to its transaction card business line. When MPS and CPI are compared based only on their transaction card business, CPI is larger.

*US Bank*

10. I have had a relationship with US Bank through Kroger since at least July 2016. My contacts at Kroger/US Bank include Jarrod Cummins (Kroger), Melinda Eigel (US Bank), and Deborah St. Germain (US Bank).

11. Attached hereto as Exhibit 2 are a sampling of emails and calendar appointments demonstrating that my contact with US Bank/Kroger dates back to at least July 2016. A few highlights from this correspondence include:

- I met with Ms. Eigel in August 2016. This was my introduction to US Bank

- I was prospecting US Bank/Kroger in 2016

- My intent to meet with the representatives at Money 2020 in 2016, the year before the event referenced in CPI's memorandum

12. I attended the US Bank event at Money 2020 in 2017 as referenced in Ms. O'Leary's declaration. I was invited to the event by John Searfoss. At no point did I receive any advice, directives, or information from John Dwyer regarding meeting with US Bank representatives at the event.

***Green Dot***

13. MPS has had a relationship with Green Dot since at least the date MPS acquired i3.

14. I recall the project referenced in Example 5 of CPI's motion. CPI and MPS were both producing gift cards for Green Dot's customer Wal-Mart.

15. To ensure MPS matched CPI's project, Green Dot provided MPS with CPI's press sheet when it visited MPS's plant in Dallas, to the best of my recollection, on March 21 or 22, 2017. Green Dot left the press sheet with MPS when it left the plant. This is a very common practice.

16. It is not unusual for two manufacturers to share a project. Typically, when a customer uses multiple manufacturers, one has to be the first one to print the project. It is often difficult to be the second manufacturer because, for uniformity in card appearance, its product must match the first, and companies may use different ink or printing machines. There are also variations in how cards may be printed by different companies.

17. For this project, CPI printed first and MPS was second.

18. Although I attended the meeting in Dallas when Green Dot provided CPI's press sheet, I left soon afterward and was not at the Dallas plant when John Searfoss continued working on, and troubleshooting, the project.

19. When MPS was comfortable that our product matched CPI's product, we needed to mail a sample of our product, along with one of the CPI samples Green Dot gave us, back to Green Dot so it could confirm their similarity and approve our product.

20. At this stage, it is important that MPS isolate a second card from CPI's press sheet that most closely resembles the one we send back to the customer so we have a point of reference.

21. On March 24, 2017, I texted John Searfoss: "Remember to cut the one CPI position that closely matches and keep a close duplicate in Dallas." (Ball Ex. 25.) By this text, I was reminding Searfoss that he should identify a second card from CPI's press most identical to the one we were mailing back to Green Dot.

22. All of the information MPS needed to complete this project was provided directly from Green Dot.

23. I never received CPI's color formula from John Dwyer.

24. To determine the colors used on the first manufacturer's product, we can use a loupe, which is like a magnifying glass. The loupe allows us to see the microscopic dots of color that make up the image, thereby allowing us to know that the printed piece was created by 4-color process versus PMS colors.

25. On June 15, 2017, I texted John Dwyer and John Searfoss "Great QBR with Green Dot." (Ball Ex. 30.) Every three months, MPS meets with Green Dot for a Quarterly Business Review. During those meetings, the "good, bad, and ugly" of all of our outstanding work is discussed. By this text, I was indicating that the "good" outweighed the "bad" feedback from the customer.

26. During that text exchange I also wrote "Your advice was priceless." (Ball Ex. 30.) I was referencing advice Dwyer gave me for dealing with a certain personality.

*Spoliation Allegations*

27. On March 29, 2017, I sent a text to Dwyer stating: "I deleted your old number." (Ball Ex. 11.) Around that time, Dwyer told me he had a new cell phone number so I was merely referencing that I had deleted his old number from my contacts so I would be sure to use his new phone number going forward.

28. On April 4, 2017, I replied to an email from Dwyer and wrote, "Delete this message (even though it is on your personal email)[.]" (Ball Ex. 12.) I saw the document Dwyer sent me said "CPI" and I made that statement because I did not want to receive CPI information and wanted to make absolutely clear I did not want or need CPI information.

29. At the time I sent the April 4, 2017 email, I had no idea there might be a dispute or litigation between CPI or Dwyer. To the best of my recollection, I first learned of a potential dispute in the summer of 2017, and it was certainly after Dwyer became employed by MPS in June 2017.

30. Since I first became aware CPI believed Dwyer was in violation of his agreements, I have not intentionally deleted or destroyed any information relating to this matter.

**[SIGNATURE PAGE FOLLOWS]**

was merely referencing that I had deleted his old number from my contacts so I would be sure to use his new phone number going forward.

28. On April 4, 2017, I replied to an email from Dwyer and wrote, "Delete this message (even though it is on your personal email)[.]" (Ball Ex. 12.) I saw the document Dwyer sent me said "CPI" and I made that statement because I did not want to receive CPI information and wanted to make absolutely clear I did not want or need CPI information.

29. At the time I sent the April 4, 2017 email, I had no idea there might be a dispute or litigation between CPI or Dwyer. To the best of my recollection, I first learned of a potential dispute in the summer of 2017, and it was certainly after Dwyer became employed by MPS in June 2017.

30. Since I first became aware CPI believed Dwyer was in violation of his agreements, I have not intentionally deleted or destroyed any information relating to this matter.

[SIGNATURE PAGE FOLLOWS]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 8/6, 2018.

Ken Glinert